# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued December 14, 2017        Decided July 10, 2018

No. 16-1058

VERITAS HEALTH SERVICES, INC., D/B/A CHINO VALLEY
MEDICAL CENTER,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

UNITED NURSES ASSOCIATIONS OF CALIFORNIA/UNION OF
HEALTH CARE PROFESSIONALS, NUHHCE, AFSCME,
AFL-CIO,
INTERVENOR

Consolidated with 16-1076, 16-1110

On Petitions for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

*Jamie Konn* argued the cause for petitioner Veritas Health Services, Inc. With him on the briefs was *Jonathan Batten*.

*Glenn M. Taubman* argued the cause for petitioner Jose Lopez, Jr. With him on the briefs was *Amanda K. Freeman*.

*Barbara A. Sheehy*, Attorney, National Labor Relations Board, argued the cause for respondent.  On the brief were *Richard F. Griffin*, *Jr.*, General Counsel at the time the brief was filed, *John H. Ferguson*, Associate General Counsel at the time the brief was filed, *Linda Dreeben*, Deputy Associate General Counsel, *Julie Broido*, Supervisory Attorney, and *Gregoire Sauter*, Attorney.

*Pamela Devi Chandran* argued the cause for intervenor. On the brief was *Jay Smith*.

Before: GRIFFITH, MILLETT and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

Concurring opinion filed by *Circuit Judge* MILLETT.

PILLARD, *Circuit Judge*:  In 2010, nurses at Chino Valley Medical Center exercised their right under federal labor law to elect a union to represent them.  In the ensuing eight years, Chino has resisted the Union and the nurses who elected it—in the workplace, before the National Labor Relations Board, and in court.  Instead of coming to any labor agreement, Chino repeatedly violated the nurses' rights in its efforts to avoid dealing with their chosen representative:  Chino threatened, coerced, and retaliated against the nurses—up to and including firing a nurse in retaliation for his visible support of the Union —and for several years Chino refused to commence bargaining with the Union, until we enforced the Board's order requiring it do so.

The National Labor Relations Board (Board or NLRB) held, in three separate orders, that Chino's management (incorporated under the name Veritas Health Services, Inc. but

referred to in this opinion as Chino) violated the National Labor Relations Act (Act or NLRA), 29 U.S.C. §§ 158(a)(1), (5), and we and the Ninth Circuit have already granted the Board's prior petitions to enforce the first two orders. *See Veritas Health Servs., Inc. v. NLRB*, 671 F.3d 1267 (D.C. Cir. 2012) (*Veritas I*); *United Nurses Ass'ns of Cal. v. NLRB*, 871 F.3d 767 (9th Cir. 2017) (*Veritas II*). Chino's failed challenges to the Board's orders have caused many years of delay and effectively stonewalled the nurses' chosen representative, the United Nurses Association of California/Union of Healthcare Professionals (Union). As recently as 2017, Chino's confirmed unfair labor practices had yet to be remedied. Now, eight years after the Union's election, collective bargaining remains in limbo, with the nurses still awaiting their first labor contract.

We consider here whether, in the midst of Chino's repeated challenges to the Board's orders, and with the Union on the verge of securing its first contract, Chino could lawfully withdraw recognition from the Union—or whether, as the Board found, its refusal to bargain constituted yet another unfair labor practice. *See Veritas Health Servs., Inc.*, 363 NLRB No. 108, 2016 WL 453588 (2016) (*Board Order*), Joint App'x (J.A.) 1-13. We also consider whether to enforce the Board's chosen remedies and whether an employee opposed to the Union had a right to intervene in the proceedings below. We conclude that federal law did not permit Chino to withdraw recognition from the Union when it did, that the Board's remedies (except one) should be enforced, and that the would-be intervenor suffered neither prejudice nor a deprivation of his due process rights when the Board declined to expand this case to encompass his claim.

## I. Background

This dispute reaches back to April 2010, when Chino's nurses voted, 72 to 39, in favor of the Union as their collective bargaining representative. In the months leading up to the election, Chino committed multiple serious unfair labor practices, as found by the Board and sustained by the Ninth Circuit. *Veritas II*, 871 F.3d at 772; *see also Veritas Health Servs., Inc.*, 359 NLRB No. 111, 2013 WL 1952152 (2013), *re-adopted*, 362 NLRB No. 32, 2015 WL 1278687 (2015). Those violations included threatening to cut back on nurses' vacation benefits and flexible scheduling, and even to shut down the hospital and to fire employees, if the nurses voted to unionize. *Veritas Health Servs., Inc.*, 359 NLRB No. 111, 2013 WL 1952152, at *9-11. A top executive also surveilled, interrogated, and threatened to discipline workers who openly supported the Union. *Id.* at *11-12.

After the representation election, Chino committed still more unfair labor practices—implementing, in effect, a "general crackdown." *Id.* at *26. Chino's chief executive officer "announced the end of the family atmosphere at Chino," telling the nurses that "henceforth, because the employees voted for the Union," the hospital "would begin strictly enforcing its policies and procedures." *Id.* at *14. True to pre-election threats, management reduced the nurses' vacation flexibility and curtailed benefits. *Id.* at *12, *34. Chino refused to provide the newly elected Union with basic information, such as employee names and contact information, that the Union needed to perform its duties. *Id.* at *36. And, within a few weeks of the election, Chino's management fired a nurse who was a visible Union supporter on the pretext that he had violated a patient's privacy. *Id.* at *16-29; *see Veritas II*, 871 F.3d at 779 (finding "all the hallmarks of a pretextual

firing" and "overwhelming evidence that [Chino] acted with a discriminatory motive in firing" the Union supporter).

The Union successfully challenged these unfair labor practices before the Board, and an NLRB Administrative Law Judge (ALJ) ordered Chino to restore its pre-unionization policies, to give the Union the withheld information, and to reinstate the nurse it had fired. *Veritas Health Servs., Inc.*, 359 NLRB No. 111, 2013 WL 1952152, at *40-42. Chino appealed to the Board and then to the Ninth Circuit—leaving the company's unfair labor practices unremedied until 2017, when that court denied its petition for review.

Meanwhile, Chino also refused to bargain with the newly elected Union. The Union, in response, sought Board enforcement of the representation election results and an order compelling Chino to come to the bargaining table. *See Veritas Health Servs., Inc.*, 356 NLRB No. 137, 2011 WL 1396024 (2011). The Board held that Chino had unlawfully refused to recognize the Union; we enforced its order in March of 2012 and required Chino to bargain. *See Veritas I*, 671 F.3d at 1271, 1274.

Within a week of our decision, on March 20, 2012, the Union contacted Chino, requesting the documents that Chino had refused to provide two years earlier. On March 22, Chino provided some, but not all, of the requested documents. The Union's chief negotiator responded that the Union would "review[] the information," "proceed[] with preparations for bargaining," and "provide suggested bargaining dates" at some point "in the near future." J.A. 283. Chino's point person for the negotiations responded: "That's fine. Please let me know the available dates you have for negotiations so we can get started right away." *Id.*

The next correspondence in the record is an April 20 letter from the Union's chief negotiator to Chino's, proposing a dozen possible bargaining dates in June and July. The parties promptly agreed to bargain on several of those dates, including the earliest one proposed by the Union, June 13, 2012. As far as the record reveals, Chino never objected to the Union's proposed timeline, raised any concerns about the pace of preparations, or asked for any earlier bargaining date. The Board later found that the three-month period between this court's order and the start of bargaining was warranted by the Union's need to "engage in extensive preparation work," including verification of current membership following "much turnover in the bargaining unit" since the election, and the complete lack of "information provided to the Union" during the two years Chino fought recognition. *Board Order* at 6 (J.A. 6).

Bargaining began as scheduled on June 13, 2012, after which the parties continued to meet and to bargain for nearly a year. Over the course of more than two dozen meetings the parties agreed on many contract terms but, in June 2013, remained apart on four—including, most prominently, compensation. At that point, Chino's most recent compensation proposal, from May 24, 2013, was on the table, and the Union had not yet accepted it.

Things came to a head on June 10, 2013. With the one-year anniversary of bargaining fast approaching—a milestone that was legally significant for reasons that will become clear—the Union informed Chino at 3:41 p.m. that it was accepting the May 24 compensation proposal and acceding to Chino's outstanding requests on the remaining terms.

At 5:09 p.m. on that same day, Chino's chief labor negotiator informed the Union via e-mail that Chino had

received a "decertification petition" apparently showing that a majority of the bargaining-unit nurses no longer wanted the Union to represent them. Citing loss of majority support for the Union, Chino abruptly withdrew recognition from the Union and refused to acknowledge any deal or to continue bargaining.[1] The Union again filed unfair labor practice charges challenging Chino's withdrawal of recognition and refusal to bargain. The ALJ rejected Chino's effort to subpoena various internal Union records, and denied a motion to intervene filed by bargaining unit member nurse Jose Lopez, who sought to testify in support of the decertification petition.

Evidence introduced at a hearing before the ALJ detailed the parties' bargaining history, including the timing and circumstances of Chino's withdrawal of recognition. The decertification petition, however, was never introduced in evidence. Chino expressed interest in introducing the petition and, if necessary, calling Lopez to authenticate it. But the Board's General Counsel and the Union would not stipulate to the petition's authenticity, triggering a lengthy back-and-forth with the ALJ over how Chino could authenticate it. After a brief recess, the ALJ ruled on the question. The parties dispute the substance of that ruling, but agree about its result: Chino's lawyers briefly huddled and, without further discussion, withdrew Chino's request to submit the decertification petition

---

[1] On June 13, the one-year anniversary of the parties' first bargaining session, Chino sent a follow-up letter "revoking and rescinding" its June 10 recognition-withdrawal communication, but again refusing to acknowledge that any deal had been struck or to continue bargaining. J.A. 311; *see also Board Order* at 7 (J.A. 7). The ALJ and the Board found that Chino's June 10 letter constituted withdrawal of recognition from the Union. Chino never challenged that factual finding. We thus treat the June 10 letter as the operative withdrawal of recognition, notwithstanding Chino's June 13 letter purporting to "rescind[]" it.

as evidence and rested without calling Lopez or any further witness.

At the close of the hearing, the ALJ ruled in favor of the Union, concluding on three independent and alternative grounds that the proffered decertification petition did not justify Chino's withdrawal of recognition. *Board Order* at 7-9 (J.A. 7-9). The ALJ ordered Chino to bargain with the Union "on the only remaining unresolved subject, the effective date of the agreement," *id.* at 9; cease and desist from "like or related" interference with its employees' rights, *id.* at 12; post and read aloud a notice to its employees, *id.*; and pay the Union's litigation costs and expenses, *id.* at 10-11.

The Board affirmed the ALJ's decision and adopted his order in essentially all respects, including all three independent grounds for holding that Chino unlawfully withdrew its recognition of the Union: (1) because Chino withdrew recognition within the parties' first year of bargaining; (2) because Chino withdrew while its prior and still-unremedied unfair labor practices continued to affect employee sentiment toward the Union; and (3) because the decertification petition never came into evidence. *Id.* at 1 n.3. The Board also sustained the ALJ's denial of intervention to Lopez. The Board supplemented the ALJ's prescribed remedies, broadening the cease-and-desist order to forbid *any* future interference with employees' collective bargaining rights; requiring Chino's notice to its employees to be mailed as well as posted; and imposing a general affirmative bargaining order.

Without first seeking reconsideration of the Board's ruling, Chino petitioned this court for review. Lopez, too, petitioned for review of the order insofar as it denied him intervention.

## II. Chino's Petition for Review

According the Board the requisite deference, we first consider whether it permissibly concluded that Chino's withdrawal of recognition from the Union was an unfair labor practice, and we uphold that determination on two independent grounds. We then consider and reject most of Chino's challenges to the Board's remedies for that violation.

### A. Standard of Review

We give considerable deference to the Board's adjudications and reverse its findings "only when the record is 'so compelling that no reasonable factfinder could fail to find' to the contrary." *Bally's Park Place, Inc. v. NLRB*, 646 F.3d 929, 935 (D.C. Cir. 2011) (quoting *United Steelworkers of Am. v. NLRB*, 983 F.2d 240, 244 (D.C. Cir. 1993)). We thus uphold the Board's decisions unless it "relied upon findings that are not supported by substantial evidence, failed to apply the proper legal standard, or departed from its precedent without providing a reasoned justification for doing so." *E.I. Du Pont De Nemours & Co. v. NLRB*, 682 F.3d 65, 67 (D.C. Cir. 2012). In particular, we defer to the Board's well-reasoned "interpretation of its own precedent," *Ceridian Corp. v. NLRB*, 435 F.3d 352, 355 (D.C. Cir. 2006) (collecting cases), as well as "the Board's application of law to facts" and any reasonable inferences it draws from those facts, *Allied Mech. Servs., Inc. v. NLRB*, 668 F.3d 758, 764 (D.C. Cir. 2012).

We review the Board's denial of an administrative subpoena for abuse of discretion. *See SSC Mystic Operating Co. v. NLRB*, 801 F.3d 302, 330 (D.C. Cir. 2015); *Joseph T. Ryerson & Son, Inc. v. NLRB*, 216 F.3d 1146, 1153-54 (D.C. Cir. 2000). A party asserting that the Board impermissibly failed to enforce the party's subpoena must show prejudice from the denial. *See Ozark Auto. Distribs., Inc. v. NLRB*, 779

F.3d 576, 585-86 (D.C. Cir. 2012); *Joseph T. Ryerson & Son*, 216 F.3d at 1154.

### B. Chino's Withdrawal of Recognition Violated the Act

Chino here challenges the Board's determination that Chino's withdrawal of recognition from, and refusal to bargain with, the Union violated Sections 8(a)(1) and 8(a)(5) of the NLRA, 29 U.S.C §§ 158(a)(1), (5).

Section 8(a)(5) of the Act "requires an employer to recognize and bargain with the labor organization chosen by a majority of its employees." *Pac. Coast Supply, LLC v. NLRB*, 801 F.3d 321, 325 (D.C. Cir. 2015); *see* 29 U.S.C. § 158(a)(5). Any failure by an employer to abide by the requirements of Section 8(a)(5) also violates Section 8(a)(1), which prohibits "interfer[ing] with, restrain[ing], or coerc[ing] employees in the exercise of the rights guaranteed in section [7 of the Act]." *Enter. Leasing Co. of Fla. v. NLRB*, 831 F.3d 534, 546 (D.C. Cir. 2016) (alterations in original) (quoting 28 U.S.C. § 158(a)(1)). Section 7, in turn, guarantees employees' right to "bargain collectively through representatives of their own choosing." 29 U.S.C. § 157.

"Under longstanding Board precedent, when a union is recognized as the collective-bargaining representative of a unit of employees, that union is entitled to a presumption that it enjoys the support of a majority of the represented employees." *Pac. Coast Supply, LLC*, 801 F.3d at 325-26 (citing *Auciello Iron Works, Inc. v. NLRB*, 517 U.S. 781, 785-87 (1996)). This presumption is ordinarily rebuttable: An employer "may unilaterally withdraw recognition" without violating the Act if it "has objective evidence that a union has lost majority support, such as a petition signed by a majority of the employees in the bargaining unit." *Tenneco Auto., Inc. v.*

*NLRB*, 716 F.3d 640, 648 (D.C. Cir. 2013) (internal quotation marks omitted).  But "[a]n employer's 'privilege' to withdraw recognition based on a petition from a majority of employees 'is not absolute.'" *Enter. Leasing Co.*, 831 F.3d at 549 (quoting *SFO Good-Nite Inn, LLC v. NLRB*, 700 F.3d 1, 6 (D.C. Cir. 2012)).  The Board invoked three such limits on that privilege as justification for its decision here.

First, there are certain times when a union's presumption of majority support is irrebuttable, such that any refusal to recognize and deal with a duly elected union—with or without a decertification petition—will violate the Act.  *See Auciello Iron Works*, 517 U.S. at 786; *Pac. Coast Supply*, 801 F.3d at 326.  As relevant here, there is an irrebuttable presumption of majority support during the first year after a union gains recognition, the so-called "certification year" bar.  *See Auciello Iron Works*, 517 U.S. at 786; *Brooks v. NLRB*, 348 U.S. 96, 104 (1954); *Chelsea Indus., Inc. v. NLRB*, 285 F.3d 1073, 1075 (D.C. Cir. 2002).  That window of detente promotes "stability in collective-bargaining relationships," allowing a union "to concentrate on obtaining and fairly administering a collective-bargaining agreement without worrying about the immediate risk of decertification," and relieving the employer of "any temptation . . . to avoid good-faith bargaining in an effort to undermine union support." *Auciello Iron Works*, 517 U.S. at 786 (internal quotation marks omitted) (quoting *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 38 (1987)); *see also Brooks*, 348 U.S. at 99-100.

Second, a decertification petition may be temporarily presumed unreliable—and thus not actionable by the employer—if the employer's past unfair labor practices "significantly contribute[d] to the loss of majority status." *Tenneco Auto.*, 716 F.3d at 648 (quoting *Williams Enters., Inc. v. NLRB*, 956 F.2d 1226, 1234 (D.C. Cir. 1992)); *see also*

*Enter. Leasing Co.*, 831 F.3d at 549. In other words, if erosion of workers' support for a union is "tainted" by an employer's prior bad acts, that taint renders the union's presumption of continuing majority support temporarily conclusive: An employer that might otherwise be allowed to act upon a decertification petition is barred from doing so while the effects of its own unfair labor practices linger. *BPH & Co., Inc. v. NLRB*, 333 F.3d 213, 218 (D.C. Cir. 2003); *see Master Slack Corp.*, 271 NLRB 78, 84 (1984). This rule prevents employers from benefiting from illegal acts that are demonstrably "of a character as to either affect the Union's status, cause employee disaffection, or improperly affect the bargaining relationship itself." *Master Slack*, 271 NLRB at 84.

Third, even when the presumption that a duly elected union continues to represent a majority of employees is fully rebuttable, the employer must bear the burden to show "actual loss of majority support"; it may not rely on a general suspicion. *Levitz Furniture Co.*, 333 NLRB 717, 725 (2001).

The Board invoked all three of these grounds in holding Chino's withdrawal of recognition unlawful. *Board Order* at 1 n.3 (J.A. 1). As discussed below, each of the first two conclusions is supported by substantial evidence, and they independently—whether separately or together—provide ample basis for denying Chino's petition and enforcing the Board's order. We therefore need not consider Chino's third argument: that Chino was unlawfully prevented from showing a loss of majority support for the Union, because the ALJ abused his discretion in preventing Chino from introducing and authenticating Lopez's decertification petition.

*1. Chino Withdrew Recognition During the "Certification Year"*

Chino first contends that the Board erred in concluding that it unlawfully withdrew recognition during the certification year, when the Union's presumption of majority support was irrebuttable. The Board found that the certification year ran from June 13, 2012—the date of the parties' first bargaining session—and thus was still in effect when Chino withdrew recognition and ceased bargaining on June 10, 2013. *Id.* at 8. Chino does not dispute that its withdrawal of recognition was unlawful if the certification year in fact ran from June 13, 2012. Instead, Chino contends that the certification year in fact began on an earlier date, and thus had already expired before its June 10, 2013, withdrawal of recognition.

The Board's prior order that we enforced—directing Chino to participate in the bargaining at issue here—specified that the certification year bar would be extended, to begin on "the date the Respondent begins to bargain in good faith with the Union." *Veritas Health Servs., Inc.*, 356 NLRB No. 137, 2011 WL 1396024, at *2. Such extensions are a standard remedy when an employer's refusal to bargain has consumed all or a substantial part of the original post-election certification year. *Dominguez Valley Hosp.*, 287 NLRB 149, 149 (1987); *see Local Union No. 2338, Bhd. of Elec. Workers*, 499 F.2d 542, 544 & n.3 (D.C. Cir. 1974); *Mar-Jac Poultry Co.*, 136 NLRB 785, 786 (1962).

Under the Board's decision in *Dominguez Valley Hospital* (which the parties agree governs here), the so-called "extended certification year" runs from the date of the parties' first formal bargaining session. 287 NLRB at 150; *see also Van Dorn Plastic Mach. Co. v. NLRB*, 939 F.2d 402, 404 (6th Cir. 1991). Here, that first bargaining session occurred on June 13, 2012.

Considered by reference to that date, Chino's withdrawal from bargaining on June 10, 2013—three days shy of a year later—was barred as premature. *See Chelsea Indus.*, 285 F.3d at 1075.

Chino nevertheless argues that a narrow exception articulated in *Dominguez Valley Hospital* renders its withdrawal lawful. Under *Dominguez Valley Hospital*, a "significant delay in the commencement of bargaining attributable to inexcusable procrastination or other manifestations of bad faith" on the Union's part may support measuring the extended certification year from an earlier start date. 287 NLRB at 150; *see also Van Dorn Plastic Mach. Co.*, 300 NLRB 278, 279 (1990) (acknowledging exception for "unwarranted delay"). That exception, however, does not apply here. Chino's petitions disputing the Union's status consumed nearly two years, but bargaining commenced within three months of our *Veritas I* opinion denying Chino's first petition. Where, as here, an employer comes to the bargaining table under court order years after a union's election, the NRLB has consistently held, and courts of appeals affirmed, that it can be entirely appropriate for the union to take three months to prepare to bargain. *See Virginia Mason Med. Ctr.*, 350 NLRB 923, 935-36 (2007), *enf'd*, 558 F.3d 891, 895 (9th Cir. 2009); *Van Dorn Plastic Mach.*, 300 NLRB at 280, *enf'd*, 939 F.2d 402, 405 (6th Cir. 1991). Of particular relevance, here the Union and Chino promptly corresponded with one another, the Union proposed mid-June as a reasonable time to commence negotiations, and Chino accepted the June 13 date without protest. And during the time leading into negotiations, Chino made no suggestion to the Union that its proposed dates were too late or that the Union was in any way dragging its feet—an important omission under the Board's precedent. *See Virginia Mason Med. Ctr.*, 350 NLRB at 935-36. Under these circumstances, the Union's three months of preparation was

not delay, much less "unwarranted" delay. *See Van Dorn Plastic Mach.*, 300 NLRB at 279.

Chino nevertheless assails the Board's finding that there was no unwarranted delay. The ALJ (affirmed by the Board) prevented it from building a record of procrastination or bad faith, Chino contends, by denying its request to subpoena internal Union communications concerning the scheduling of bargaining. Even assuming such evidence would be discoverable, the ALJ did not abuse his discretion in quashing the subpoena requests at issue. As discussed above, the Board has made clear that three months—the time that elapsed here—is a reasonable period to prepare for bargaining under circumstances like these. *Dominguez Valley Hosp.*, 287 NLRB at 149-50 & n.1; *see Van Dorn Plastic Mach.*, 300 NLRB at 280; *Virginia Mason Med. Ctr.*, 350 NLRB at 935-36. This case is unlike *Ozark Automotive Distributors*, 779 F.3d 576, in which we held an ALJ's flawed subpoena denial was an abuse of discretion because the missing evidence prejudiced a critical element of that case. *See id.* at 581-83. The ALJ here, in contrast, permissibly concluded that the Union was "fairly entitled to" the three months it took, *Van Dorn Plastic Mach.*, 939 F.2d at 405, thereby rendering any internal Union communications about scheduling "irrelevant," Order Denying Respondent's Petition to Revoke Subpoena at 3-4 (Nov. 17, 2014) (J.A. 150-51).

Attempting to recast three months as an unreasonable delay, Chino cites two cases—*Hudson Chemical Co.*, 258 NLRB 152, 157 (1981), and *Wright Motors, Inc.*, 237 NLRB 570, 575 (1978)—in which the Board faulted employers for refusing to commence bargaining for periods of three months or less. But those cases ask the legally distinct question whether the employers had violated their statutory obligations to "meet at reasonable times" and to bargain in good faith.

*Hudson Chem.*, 258 NLRB at 157; *Wright Motors*, 237 NLRB at 575. Neither case purports to interpret or to apply the *Dominguez Valley Hospital* exception for unwarranted delays by a union preparing for initial bargaining, and neither raises any doubt that three months was reasonable given the circumstances the Board confronted here.

The Board reasonably determined that the extended certification year began on June 13, 2012. The ALJ did not abuse his discretion in denying Chino's subpoena, and the Union did not delay in coming to the bargaining table. The Board thus validly held that Chino's withdrawal of recognition on June 10, 2013, was within the certification year and so unlawful.

### 2. *Chino's Unfair Labor Practices "Tainted" Any Loss of Majority Support*

We also consider Chino's challenge to the Board's second, independent basis for finding its withdrawal of recognition unlawful: that the employer's many unremedied unfair labor practices during and after the election tainted the June 2013 decertification petition. Chino contends that the Board misapplied precedent governing when an unfair labor practice taints a subsequent decertification effort. An employer's unfair labor practices taint a union's loss of majority support where there is a "causal nexus" between the two. *Williams Enters.*, 956 F.2d at 1235. The Board thus bears "the burden of adducing substantial evidence to support its finding that an employer's unfair labor practices have significantly contributed to the erosion of a union's majority support." *Tenneco Auto.*, 716 F.3d at 648 (internal quotation marks omitted).

The parties agree that the presence or absence of a causal nexus between unfair labor practices and a union's loss of

majority support is determined under the test set forth in *Master Slack*, 271 NLRB 78. *See Tenneco Auto.*, 716 F.3d at 648; *BPH Co.*, 333 F.3d at 218; *Williams Enters.*, 956 F.2d at 1236. To guide the Board in distinguishing between employees' disaffection for a union due to its own poor performance, and disaffection because of the employer's labor law violations, the *Master Slack* test describes four overlapping factors:

> (1) The length of time between the unfair labor practices and the withdrawal of recognition; (2) the nature of the illegal acts, including the possibility of their detrimental or lasting effect on employees; (3) any possible tendency to cause employee disaffection from the union; and (4) the effect of the unlawful conduct on employee morale, organizational activities, and membership in the union.

271 NLRB at 84. The Board applies the *Master Slack* test to determine when a decertification petition should not be taken to reflect the voluntary choice of a bargaining unit's employees because it was signed in an atmosphere rendered threatening or coercive by an employer's unfair labor practices.

The *Master Slack* test allows parties to focus on objective and readily discernible considerations. It calls on the Board to consider the nature and timing of the unfair labor practices as they bear on the reasonable likelihood of discouraging employees under a given set of circumstances from continuing to support their union. Even though *Master Slack* refers to the "effect" of employers' misconduct on employees' "morale," the Board does not read it to license intrusive direct probing of the specific employees' subjective attitudes. Instead, the Board has held that "it is the objective evidence of the commission of unfair labor practices that has the tendency to undermine the Union, and not the subjective state of mind of the employees,

that is the relevant inquiry in this regard." *AT Sys. West, Inc.*, 341 NLRB 57, 60 (2004); *see Wire Prods. Mfg. Corp.*, 326 NLRB 625, 627 & n.13 (1998) (looking to violations' "foreseeable tendency to weaken employee support for the Union" as reasonable basis "to infer that they contributed to the employee disaffection," and specifying that the causation analysis does not require a showing of "actual knowledge by the employees of the unfair labor practices").

Here, the Board relied on substantial—indeed, very robust—evidence going principally to the first three factors to find that Chino's past unfair labor practices tainted any decertification petition. On the second and third factors, the Board found that Chino's unremedied unfair labor practices were "numerous" and "egregious"; they included multiple "hallmark violations" and were precisely "the sort that cause disaffection among employees." *Board Order* at 8 (J.A. 8). Chino's retaliatory termination of a prominent Union supporter was, the Board found, "especially coercive" and "not likely to be forgotten, even over a period of years." *Id.* at 7 (citing *Penn Tank Lines, Inc.*, 336 NLRB 1066, 1067-68 (2001); *Koons Ford of Annapolis*, 282 NLRB 506, 508 (1986); and *United Supermarkets, Inc.*, 287 NLRB 119, 120 (1987)). Chino's threat to shutter the hospital and its curtailment of employee benefits also constitute "the types of violations that have detrimental and lasting effects." *Tenneco Auto.*, 716 F.3d at 650. Accordingly, the second and third *Master Slack* factors— the nature of the unfair labor practices and their tendency to cause disaffection from the Union—weighed heavily in favor of the Board's conclusion that Chino's prior transgressions tainted any Union decertification effort.

The Board also found, under the first factor, that three years was too little time to "ameliorate the effect of" such severe and pervasive unfair labor practices. *Board Order* at 8

(J.A. 8). That finding, too, comported with Board precedent recognizing that a decertification petition may be "unreliable as an indicator of uncoerced employee sentiment" if it "arose during the time when the [employer] had not yet fully remedied its many unfair labor practices." *United Supermarkets*, 287 NLRB at 119-20. While the decertification petition was circulating among the nurses at Chino Valley Medical Center, all of Chino's election-related unfair labor practices remained unremedied as a result of its time-consuming and ultimately unsuccessful challenges. *Board Order* at 8 (J.A. 8). In particular, Chino had yet to do anything to reinstate or otherwise make whole the nurse it fired three years earlier in retaliation for his Union support. Unlawful retaliatory firings are "precisely the type of coercive conduct" that can have lasting effects even five or more years later. *United Supermarkets*, 287 NLRB at 120.

Chino attacks the causation evidence only by reference to the fourth *Master Slack* factor—the effect on employee morale, organizational activities and support for the Union—arguing that it was the Union's failings that drove employees away. In Chino's view, testimony in the record established that employees signed the decertification petition because of dissatisfaction with the Union's slow progress in negotiations, not because the company's unfair labor practices stymied the Union and suppressed its support. Chino cites a lone statement by a Union organizer on cross-examination:

> When I had discussion with folks, a lot of people were saying . . . that things weren't moving as fast as they were when they first started negotiations, that the turnover was very high, that there were now techs or other folks in the facility talking poorly about the Union. Therefore, morale was really low.

Hearing Transcript at 164 (J.A. 385). But most of the time that passed between the Union's 2010 election and its 2013 bargaining effort was spent litigating Chino's labor violations. That delay would naturally contribute to the employees' impatience. Thus, even assuming its relevance, the testimony on which Chino relies is at least consistent with Chino's actions being the primary reason for any employee dissatisfaction.

In any event, the Board was well within its discretion to consider that fragment of testimony insufficient to overcome the taint powerfully evinced by Chino's unremedied labor violations. In other cases like this one—in keeping with the objective focus of its test—the Board has found causation due to sufficiently severe, unremedied violations without direct evidence of what motivated employees to petition for decertification. *See Overnite Transport. Corp.*, 333 NLRB 1392, 1394-95 & n.16 (2001); *United Supermarkets*, 287 NLRB at 120. That approach makes good sense: Because employees may often wish both to be represented by a union and to avoid antagonizing their employer, it is not always desirable to elicit testimony that "the Company had done nothing to influence their decision," nor is such testimony particularly probative. *Tenneco Auto.*, 716 F.3d at 651. Indeed, "questioning employees about the subjective motives for their representation preferences" may "result in 'endless and unreliable inquiry.'" *SFO Good-Nite Inn*, 357 NLRB 79, 83 (2011), *enf'd*, 700 F.3d 1 (D.C. Cir. 2012).

Chino alternatively suggests that its "good faith bargaining" up until June 2013 might have had some additional "ameliorative effect" not present in *Overnite Transportation* or *United Supermarkets* (where bargaining occurred for a somewhat shorter period before the employer withdrew recognition). Chino Reply Br. 5. But the Board rejected a similar argument in *Overnite Transportation* on the ground

that, so long as serious violations remain unremedied, "bargaining by the Employer with the Union . . . cannot suffice to cure the [t]aint of the decertification petitions." 333 NLRB at 1396. In sum, Chino's case is, at most, arguably "*distinguishable* from" *Overnite Transportation* and *United Supermarkets*, not "a *departure* from those cases," such as would invalidate the Board's holding. *Ceridian Corp.*, 435 F.3d at 356 (emphases in original).

That leaves only Chino's argument that we must vacate the Board's rejection of the decertification petition as tainted because, Chino says, the ALJ's earlier decision to quash Chino's subpoena erroneously depended on a premature and factually underdeveloped application of the *Master Slack* test. Chino identifies no evidence its subpoena sought that could have affected the *Master Slack* analysis in any "significant way[]," *Ozark Auto. Distribs.*, 779 F.3d at 585 (quoting *Ind. Hosp., Inc. v. NLRB*, 10 F.3d 151, 154 (3d Cir. 1993)). Perhaps that is because the few document requests that seem even arguably relevant were sweeping requests for the Union's internal communications, not geared toward potential causes of employee disaffection. The subpoena, for example, sought "[a]ll documents that relate to the Union's knowledge of any efforts by Chino employees to decertify the Union from June 10, 2012 to present" and "[a]ll documents concerning, reflecting, supporting, or relating to any alleged unfair labor practices asserted by the Union." Order Denying Resp't's Pet. to Revoke Subpoena at 2, 5 (Nov. 17, 2014) (J.A. 149, 152). Because Chino has identified no prejudice caused by the subpoena denial to its ability to respond to the General Counsel's *Master Slack* showing, the denial does not affect the Board's finding that the decertification petition was tainted by Chino's unfair labor practices. *See id.* at 582-83.

### C. The Board's Choice of Remedies Was Appropriate

Having determined that the Board permissibly held that Chino engaged in unfair labor practices, we next consider the remedies the Board imposed. Our review of the Board's remedial choices "is especially deferential" under 29 U.S.C. § 160(c), which accords the Board "'broad discretionary power . . . to fashion remedies.'" *Oberthur Techs. of Am. Corp. v. NLRB*, 865 F.3d 719, 726 (D.C. Cir. 2017) (alteration in original) (quoting *Petrochem. Insulation, Inc. v. NLRB*, 240 F.3d 26, 34 (D.C. Cir. 2001)); *see NLRB v. Gissel Packing Co.*, 395 U.S. 575, 612 n.32 (1969); *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 216 (1964).

Chino challenges several of the Board's chosen remedies as unsupported by the record and unduly harsh. With one exception, we enforce the Board's remedies—either because we lack jurisdiction to consider them, or because Chino's challenges fail on their merits.

### 1. Remedial Challenges We Lack Jurisdiction to Consider

As a threshold matter, the Board notes that we are barred from reviewing several of Chino's challenges because Chino failed to first present its objections to the Board, as required by 29 U.S.C. § 160(e). *See Enter. Leasing Co.*, 831 F.3d at 550. Even though the Board broadened several of the ALJ's proposed remedies, Chino was obligated to at least raise its concerns in a motion for the Board's reconsideration before seeking this court's review. *See Int'l Longshore & Warehouse Union v. NLRB*, 890 F.3d 1100, 1113 (D.C. Cir. 2018); *HealthBridge Mgmt., LLC v. NLRB*, 798 F.3d 1059, 1069 (D.C. Cir. 2015); *Lee Lumber & Bldg. Material Corp. v. NLRB*, 310

F.3d 209, 216-17 (D.C. Cir. 2002). But Chino did not seek Board reconsideration.

We are thus barred from considering Chino's challenges to two remedies: (1) the Board's order that Chino cease and desist from any and all violations of its employees' Section 7 rights, *Board Order* at 3 (J.A. 3), which broadened the ALJ's more targeted remedy requiring Chino to cease and desist only from "like or related" violations, *id.* at 12; and (2) the Board's requirement that Chino mail notice of its ruling to the employees, *id.* at 3. Because Chino challenged neither of those remedies before the Board, *see* Respondent's Exceptions to ALJ Decision at 7 (J.A. 180); Respondent's Brief in Support of Exceptions at 15-19 (J.A. 197-201), we cannot review them.

Chino argues that it constructively challenged the Board's broadened cease-and-desist order. The Board justified that order in part by finding that Chino had demonstrated a "proclivity" for violating labor laws, and Chino contends that was similar to a finding of "repeated unlawful conduct" that partly undergirded a separate notice-reading remedy—which Chino *did* dispute in its exceptions to the Board. *See Board Order* at 1, 11 (J.A. 1, 11). In Chino's view, the unchallenged "proclivity" finding is equivalent to the "repeated unlawful conduct" finding that it had already challenged, such that Chino's earlier objection gave the Board notice that it opposed the similar, later finding as well.

Chino's attempt to smuggle a challenge to the broad cease-and-desist order into its notice-reading exception fails because it did not "state with particularity the material error claimed," as was required. 29 C.F.R. § 102.48(c)(1). The mere fact that Chino challenged a similar determination underpinning a different remedy would not put the Board on "adequate notice" that Chino considered the Board to have insufficiently justified

the cease-and-desist order. *Alwin Mfg. Co. v. NLRB*, 192 F.3d 133, 143 (D.C. Cir. 1999); *see also United Food & Commercial Workers Union Local 204 v. NLRB*, 506 F.3d 1078, 1087 (D.C. Cir. 2007).

Chino also argues that it should be excused from seeking reconsideration because it here challenges the sufficiency of the Board's reasoning. Chino says that, despite past orders of this court taking the Board to task for inadequate reasoning, the Board has a persistent practice of under-explained decisions. Chino makes the rather remarkable argument that what it sees as the Board's insufficient regard for the lessons of our past decisions means that "[a]sking the Board to explain its reasoning in a motion for reconsideration would have been a futile exercise." Chino Reply Br. 14. Our prior reversals of some Board decisions hardly licenses Chino to simply sidestep the statutorily mandated Board review. We do not doubt that the Board would have given due consideration to a timely objection or motion for reconsideration.

### 2. *Remedial Challenges We Resolve on Their Merits*

Chino challenged two remedies before the Board, giving us jurisdiction to review the merits of those challenges. Specifically, Chino contested the Board's remedial orders requiring that (1) Chino pay litigation costs and expenses, and (2) Chino's management publicly read a notice to its employees concerning its unlawful conduct.

As to the first challenge, the Board agrees that its award of litigation costs and expenses was incorrect and "does not seek enforcement of those portions of its Order," citing our decisions in *HTH Corp. v. NLRB*, 823 F.3d 668 (D.C. Cir. 2016), and *Camelot Terrace, Inc. v. NLRB*, 824 F.3d 1085

(D.C. Cir. 2016). We therefore grant Chino's petition for review on that issue and vacate that portion of the order.

Chino's other challenge—to the public notice reading—fails. The Board reasonably determined that Chino's unfair labor practices were numerous and egregious, rising to the level of "repeated unlawful conduct" that "likely had the effect of chilling employees' Section 7 activities," making such a reading necessary "to fully dissipate the[] coercive effect" of Chino's accumulated misdeeds. *Board Order* at 11 (J.A. 11). We have recognized that a public reading may be appropriate where, as here, upper management has been directly involved in multiple violations of the Act. *See Federated Logistics & Operations*, 400 F.3d at 929-30; *United Food & Commercial Workers Union v. NLRB*, 852 F.2d 1344, 1348-49 (D.C. Cir. 1988).

Chino makes no persuasive case that we should overturn the Board's choice of remedies. Indeed, Chino does not meaningfully contest in this court that its unfair labor practices, several of which were committed by upper management, were "pervasive" enough to support the notice reading remedy. *See United Food & Commercial Workers Union*, 852 F.2d at 1349. Chino argues instead that its participation in bargaining for nearly a year obviated the need for a reading. But it cites no authority—of either the Board or any court—endorsing that view. And it would make no sense to compel the Board to treat Chino's bargaining as foreclosing this remedy when that bargaining was bookended by unfair labor practices: Chino had to be forced to the bargaining table under court order, then committed yet another unfair labor practice when it cut bargaining short without lawful justification.

Chino alternatively argues that the Board's unfair labor practice holdings were insufficiently final to support a notice

reading requirement while those findings remained pending review in the Ninth Circuit. The Ninth Circuit has since enforced the Board's determinations. *See Veritas II*, 871 F.3d 767. We therefore enforce the Board's notice-reading remedy.

In sum, because the Board reasonably determined both that Chino's withdrawal of recognition occurred within the extended certification year and that Chino's unfair labor practices tainted any decertification petition, we enforce the Board's order insofar as it held that Chino committed an unfair labor practice by withdrawing recognition from and refusing to bargain with the Union. We also enforce all but one of the Board's remedies for that violation, granting Chino's petition for review only as to the Board's award of litigation costs and expenses.

### III. Lopez's Petition for Review

Lopez, the nurse who circulated the decertification petition, seeks review of the Board's order insofar as it affirmed the ALJs' decisions denying his intervention. Lopez contends that the Board's decision not to permit him to intervene was arbitrary and erroneous, and that it hindered his ability to avoid unwanted representation by a union that, he believes, lacked majority support. He also contends that the Board violated his procedural due process rights by treating the Union as his representative without giving him "any opportunity to be heard." Lopez Br. 29. We review the Board's affirmance of an ALJ's discretionary judgments, including whether to deny a motion to intervene, for abuse of discretion. *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. NLRB*, 392 F.2d 801, 809-10 (D.C. Cir. 1967); *see also Midwest Div.—MMC, LLC v. NLRB*, 867 F.3d 1288, 1303 (D.C. Cir. 2017); *Perdue Farms, Inc.,*

*Cookin' Good Div. v. NLRB*, 144 F.3d 830, 833-34 (D.C. Cir. 1998).

We need not decide whether the ALJ abused his discretion in denying Lopez's motion to intervene because, even if he had, Lopez has shown no prejudice flowing from the denial. Lopez argued that he should be granted intervention to argue that the Union no longer enjoyed majority support in view of the decertification petition, which he also sought to introduce, authenticate, and testify about. Lopez Motion to Intervene at 5 (J.A. 50); *see also* Lopez Declaration (J.A. 61-63). But, for the reasons discussed above, *see* Part II.B.1, even assuming the validity of Lopez's petition, any loss of majority support for the Union would not have been actionable during the still-pending extended certification year, *see Auciello Iron Works*, 517 U.S. at 786; *Brooks*, 348 U.S. at 104; *Chelsea Indus.*, 285 F.3d at 1075. The ALJ correctly noted as much in denying intervention. *See* Order Denying Motion to Intervene at 2-3 (J.A. 69-70).

Nor could Lopez's evidence have dissuaded the Board from entering its remedial order that Chino bargain with the Union. To the contrary, the Board's order expressly acknowledged the "temporary impact the affirmative bargaining order will have on the rights of employees who oppose continued union representation," but found that impact "outweigh[ed]" by (among other considerations) Chino's history of "serious violations" and the need to enforce the certification-year bar to ensure employees sufficient time to "fairly assess for themselves the Union's effectiveness as a bargaining representative." *Board Order* at 2 (J.A. 2). Lopez therefore has not shown prejudice from his inability to participate in the proceedings. *See Prairie State Generating Co. LLC v. Sec'y of Labor*, 792 F.3d 82, 94 (D.C. Cir. 2015).

Lopez further complains that the denial of intervention was arbitrary, because the Board, in his view, failed to identify and apply consistent standards to govern employees' requests to intervene in unfair labor practice proceedings against their employers. We have no cause to resolve that contention because, again, Lopez was not prejudiced by the denial of intervention in any event.

Lopez's claim that the denial of intervention violated his due process rights also fails. Lopez argues that the Board's decision denying his motion to intervene deprived him, without adequate process, of a constitutionally protected interest— whether based in liberty or property—to be free of representation by a union he believes has lost majority support. But ample authority holds that the Board may—indeed, must— balance competing interests in this context, including by sometimes requiring dissenting employees to accept representation by a duly elected union for a prescribed period of time. *See Commc'ns Workers of Am. v. Beck*, 487 U.S. 735, 745 (1988); *NLRB v. Gissel Packing Co.*, 395 U.S. at 613; *Franks Bros. Co. v. NLRB*, 321 U.S. 702, 705-06 (1944); *Chelsea Indus.*, 285 F.3d at 1077.

Even assuming Lopez had a constitutionally cognizable interest in bringing his decertification arguments before the Board, he failed to explain why other processes available to him under the Act were insufficient to vindicate his interests. Specifically, he offers no persuasive explanation why Section 9(c) of the Act—which establishes a procedural mechanism for employees like Lopez to cast off a minority union by presenting a decertification petition directly to the Board—is inadequate to vindicate his interests. *See* 29 U.S.C. § 159(c)(1) (providing that "the Board shall investigate" any "petition . . . assert[ing] that . . . [a] labor organization . . . is no longer a representative" because it does not enjoy majority support); *see id.* § 159(a).

Lopez contends that resort to Section 9(c) proceedings might in practice prove "futile," because resolution of the pending unfair labor practice charges against Chino would preclude the result he seeks under the Board's so-called "blocking charge" doctrine. Lopez Br. 13-14; *see Peoples Gas Sys., Inc. v. NLRB*, 629 F.2d 35, 39 & n.5 (D.C. Cir. 1980). But the authorities he cites suggest just the opposite: that a Section 9(c) petition could succeed notwithstanding an unresolved unfair labor practice charge against Chino—so long as Lopez could establish in those proceedings that an uncoerced majority of the workforce supported decertification independent of the employer's alleged misconduct, or that the unfair labor practice charges lacked merit. *See St. Gobain Abrasives, Inc.*, 342 NLRB 434, 434-35 (2004); NLRB Casehandling Manual, Part Two: Representation Proceedings §§ 11730, 11731.2 (Jan. 2017), https://www.nlrb.gov/sites/default/files/attachments/basic-page/node-1727/CHM%20Part%20II%20Jan%202017.pdf (*NLRB Casehandling Manual*).

Lopez further contends that he cannot file a decertification petition with the Board while Chino's case is pending, because "it would be dismissed—there is no union to decertify" until and unless Chino must recognize the Union. Lopez Reply Br. 13. He again cites nothing supporting that proposition; his own authorities suggest otherwise. *See, e.g.*, *NLRB Casehandling Manual* at § 11730.3(b) (setting forth procedures for concurrent handling of representation proceedings and "recognition issues," including "failure to recognize or bargain"). Requiring Lopez to await the outcome here and temporarily abide union representation before proceeding to seek decertification is an "inevitable" consequence of balancing the competing interests at stake. *Chelsea Indus.*, 285 F.3d at 1077; *see also Gilbert v. Homar*, 520 U.S. 924, 930 (1997); *Gissel Packing Co.*, 395 U.S. at 613; *Franks Bros.*, 321 U.S. at 705-06.

At bottom, the procedures available to Lopez are not constitutionally inadequate simply because he opposes the substantive outcome they may produce. Congress and the Board considered the interests of employees in Lopez's position and provided another procedure for them to be heard, even if intervention is not appropriate, that proceeds via a petition to the Board under Section 9(c). Lopez has given us no sound reason to think that procedural design is constitutionally deficient. We therefore hold that he had available to him all the process he was due.

## IV. Conclusion

For the foregoing reasons, we deny Chino's petition for review as to all aspects of the Board's order save for its award of litigation costs and expenses, which we vacate. We grant the Board's cross-application for enforcement with the same limitation. We also deny Lopez's petition for review.

*So ordered.*

MILLETT, *Circuit Judge*, concurring: I join the majority opinion in full. I write separately only to express my concerns about the Board's continued failure to establish any discernible, consistent standard for granting and denying intervention in agency proceedings.

In this case, the Board just stated summarily that the denial of Lopez's motion to intervene fell "within established precedent concerning decertification petitioners' requests to intervene in unfair labor practice proceedings." *Board Order* at 1 n.1. Tellingly, the Board did not cite to any cases that might constitute such a coherent body of "established precedent." Nor am I aware of any. Claims for deference through paeans to agency precedent only work if a principled body of precedent actually exists.

Instead, the Board cited only to its generic intervention rule, 29 C.F.R. § 102.29 (2016). *Board Order* at 1 n.1. The problem, though, is that the cited regulation provides no substantive standards or guidance at all on when intervention is or is not proper in agency proceedings. Other than outlining the mechanical steps that an intervention request goes through, the rule says only that intervention "may" be permitted "to such extent and upon such terms as [the ALJ or regional director] deem[s] proper." *Id.* That is it. Seems hard to imagine a more amorphous and indeterminate standard. *Contrast* FED. R. CIV. P. 24 (spelling out specific factors for courts to consider in resolving motions to intervene).

The Board's persistent failure to put any meat on the regulation's bare bones leaves individual intervention decisions at risk of arbitrary and inconsistent resolution. As it turns out, that failing is ultimately without consequence in this particular case because Lopez's claims on intervention pertain to a legally foreclosed decertification petition. But it remains incumbent on the Board to formulate objective and reliable standards for intervention in its proceedings. The transparent,

consistent, and evenhanded application of identified and reasoned factors is essential to fair process for *all* would-be intervenors, regardless of on which side of a case they wish to appear.