United States Court of Appeals,

Fifth Circuit.

No. 96-60561.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

HI-TECH CABLE CORPORATION, A Subsidiary of Southwire Company,
Respondent.

Nov. 14, 1997.

On Application for Enforcement of an Order of the National Labor
Relations Board.

Before WISDOM, DUHÉ and BARKSDALE, Circuit Judges.

PER CURIAM:

The National Labor Relations Board ("Board") seeks enforcement
of an August 1995 Decision and Order ("Order") it issued against
respondent/appellant, Hi-Tech Cable Corporation ("Hi-Tech";
"Company"), a subsidiary of Southwire Company. The Board found
that Hi-Tech had committed numerous violations of the National
Labor Relations Act ("NLRA"; "Act").[1] We grant enforcement in
part, and deny enforcement in part.

I.

This case is the most recent of several disputes that arose
between the International Brotherhood of Electrical Workers, Local
Union 1510 ("Union") and respondent, Hi-Tech, at the latter's
Starkville, Mississippi facility. The Union filed a series of
charges against Hi-Tech between March and September 1993, alleging
several violations of the NLRA. On August 10, 1995, the Board

---

[1] 29 U.S.C. § 150 *et seq.*

1

issued an order finding that Hi-Tech had engaged in several unfair labor practices in violation of §§ 8(a)(1), (3), and (5) of the Act.[2] The Board predicated its decision on several factual and legal findings that are set forth below. These findings are the subject of our review.

In June 1991, the Union filed an unfair labor practice charge against Hi-Tech, alleging that the Company violated several provisions of the NLRA by unilaterally adopting and reinforcing a rule that prohibited the use of tobacco products at its Starkville facility.[3] In September 1992, the Board issued an order in favor of the Union, finding that the Company had violated the Act as charged.[4] On January 7, 1993, Hi-Tech began to comply with the order by posting a Board-mandated notice pledging to rescind the no-tobacco usage rule. In addition, Hi-Tech elected to post its own notice, in which it both informed its employees of the rescission and expressed a willingness to bargain collectively with

---

[2]The Administrative Law Judge rendered a preliminary decision on June 27, 1994. In all meaningful respects, the Board affirmed the ALJ's findings.

[3]In July 1992, the Union filed separate charges against the Company alleging various violations of §§ 8(a)(1), (3) and (5) of the Act. On September 10, 1992, the parties entered into a settlement agreement that required the Company to post a remedial notice stating that it would not (1) discriminatorily enforce its no solicitation rule by prohibiting Union solicitations and permitting non-Union solicitation; (2) promise to improve benefits if the employees rejected the Union; (3) inform employees that retaining the Union was futile; (4) solicit support for a decertification effort; or (5) violate the employees' § 7 rights in any other respect.

[4]The 1992 order is not subject to review by this Court.

respect to tobacco usage.[5]  These notices remained posted for the 60-day remedial period mandated by the Board.  During this time, however, other signs that declared the Starkville plant to be a non-smoking facility remained posted at separate entrances to employee and visitor parking lots.[6]

On January 10, 1993, three days after Hi-Tech began to comply with the Board's 1992 order, Jimmy Jones applied for a job with the Company.  The Board found that Hi-Tech declined to offer employment to Jones because he expressed pro-Union sentiments in response to questioning from Jim French, the Company manager who interviewed him.  The Board also found that during the interview, French violated § 8(a)(1) by stating that the Union was ineffective in securing benefits for affiliated employees.[7]

Also in January 1993, Hi-Tech hired William Scott as a temporary employee.  Hi-Tech laid him off in March 1993, citing lack of work as its justification.  The Board, however, found that Hi-Tech, in violation of §§ 8(a)(3) and (1), dismissed Scott because of his pro-union sympathies.  Specifically, the Board concluded that the company informed Scott of his termination on March 29 because he wore a pro-union t-shirt to work that same day.

---

[5]Three bargaining sessions over the no-tobacco rule ensued. The substance of those sessions is discussed below.

[6]Throughout this dispute, Hi-Tech continued lawfully to maintain a no-tobacco usage policy as applied to visitors and unrepresented employees at its Starkville plant and 17 other non-union facilities.  The Company had posted the signs in 1991.

[7]The Board also found that Hi-Tech managers made similar unlawful statements to other applicants and employees during the five-month period of January to May, 1993.

3

In April 1993, Vernita Robinson received the employee of the month award. Both the ALJ and the Board found that manager Gerri Tate approached Robinson a day or two before she received the award to discuss a pro-union button she had attached to her clothing. They further found that Tate unequivocally implied, in violation of § 8(a)(1), that some benefit would accrue to Robinson if she removed the button and supported a pending decertification effort. Robinson indicated her willingness to cooperate, and received the award a day or two later.

In early February 1993, anti-Union employees circulated a decertification petition. Forty-two employees signed decertification cards between February 11 and March 7, the period during which Hi-Tech was in compliance with the Board's 1992 order. In May 1993, Hi-Tech received decertification cards signed by 117 of its 203 Union-represented employees. Based on its belief that the Union no longer enjoyed majority support, the Company withdrew recognition from the Union. Shortly thereafter, Hi-Tech ceased processing grievances, and on June 3, 1993, announced a wage increase.[8] The Board concluded that Hi-Tech violated §§ 8(a)(5) and (1) by wrongfully withdrawing recognition from the Union. In particular, the Board found that the decertification cards upon which the Company relied were tainted by the unfair labor practices

---

[8]Hi-Tech posted a notice the following day stating that it was "pleased to announce that effective June 6, 1993, a 60 cents per-hour wage increase will be implemented for all hourly-paid production and maintenance employees. We are taking this action because we feel our plant has fallen somewhat behind in wages over the last year or so."

it had identified.

II.

A. Bargaining Over No-Tobacco Rule

Company and Union negotiators met on three separate occasions to bargain over the no-tobacco rule the Company sought to implement. The first of these sessions was held on February 16, 1993. During the course of this meeting, Hi-Tech cited several justifications for a plant-wide prohibition of tobacco use. In an effort to communicate Hi-Tech's health-related concerns, Company negotiators presented Union negotiators with numerous articles and graphs concerning the deleterious health effects of smoking. Company representatives plainly stated that "the bottom line here is the company is concerned about the effects of tobacco use on the health of its employees and the cost impact of these health problems on the company." In addition to expressing concerns over potential employee health problems and accompanying losses in productivity, Hi-Tech negotiators explained that a company-wide policy required that it prohibit the use of tobacco at the Starkville facility. For its part, the Union suggested that the Company designate a limited smoking area for employees who wished to use tobacco. In response, the Company reiterated its concerns and its desire to enact an absolute ban on the use of tobacco products. The Union also expressed its disapproval of the continued presence of signs posted at the Company's parking lot entrances declaring that the Starkville facility was smoke-free. The meeting adjourned without agreement between the parties.

5

Company and Union negotiators reconvened the following day. The Union submitted proposals that would allow smoking in designated areas.[9] Union representatives also proposed that Hi-Tech remove the no-tobacco sign at the entrance to the employee parking lot. Hi-Tech negotiators rejected the Union's proposals because none addressed the Company's principal concerns about employee health, corporate policy, and continuous movement to and from workstations for smoke breaks. For the second time in as many days, the parties failed to reach an agreement.

The parties met a final time on March 16, 1993. The Union proposed that the Company permit tobacco use in the employee parking lot, designate two indoor areas for tobacco use, and remove the no-tobacco sign at the entrance to the employee parking lot. Hi-Tech negotiators rejected the proposals for the same reasons they rejected previous Union proposals. As one Company negotiator stated,

> We reviewed the Union proposal on tobacco use and what we see is that this proposal still encourages employees to use tobacco products. It has been the Company's position from day one that one of our aims is to discourage employee use [rather than] encourage it. You continue to encourage the use of tobacco. The reason we want to discourage it is that it causes disease.

Union negotiators, however, explicitly stated that they had no intention of addressing the adverse health effects associated with tobacco use.

---

[9]Specifically, the Union twice proposed that tobacco use be permitted at any or all of the following locations: (1) the employee parking lot; (2) a designated area adjacent to each department restroom; and (3) rooftop. The Union also offered to furnish ashtrays and signs admonishing smokers not to litter.

Hi-Tech negotiators also repeated their concerns over litter, employee movement, and the company-wide prohibition of tobacco use. Union negotiators then stated that no additional proposals were forthcoming. Finally, the Company declared an impasse. On March 29, 1993, it once again implemented the no-tobacco rule.[10]

The Board found that Hi-Tech violated §§ 8(a)(1) and (5) of the Act (29 U.S.C. § 158(a)(1) and (5))[11] by failing to bargain with the Union in good faith about its proposed no-tobacco usage policy. Accordingly, the Board ordered that Hi-Tech do the following: (1) cease and desist from unilaterally implementing a no-tobacco usage policy; (2) recognize the Union as the exclusive collective bargaining representative for all employees in the appropriate unit, and, on request, bargain in good faith with the Union about the usage of tobacco; and (3) rescind, on request by the Union, the no-tobacco usage policy it implemented on March 29, 1993.

---

[10]The Company posted a notice throughout the plant that stated the following: "Effective Monday, March 29, 1993, the Southwire-Starkville Plant will become a No-Tobacco Usage Facility. No tobacco usage will be permitted within the property lines of Southwire Company. The property lines include plant, office, Company vehicles and all parking lots as well as grounds surrounding these areas."

[11]§ 158(a)(5): "It shall be an unfair labor practice for an employer to refuse to bargain collectively with the representatives of his employees."

§ 158(a)(1): "It shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title."

§ 157: "Employees shall have the right to bargain collectively through representatives of their own choosing."

Courts of appeal will not disturb the Board's findings of fact if they are supported by substantial evidence on the record considered as a whole.[12]  We may not displace reasonable inferences drawn by the Board from its findings of fact, even if we might have reached different conclusions had the matter been before us de novo.[13]  In the instant controversy, our task is to determine whether substantial evidence supports the Board's conclusion that Hi-Tech committed unfair labor practices by failing to bargain in good faith with the Union over tobacco use at the Starkville facility.  We hold that the Board's conclusion is not supported by substantial evidence, and thus decline to enforce this aspect of its order.

As a preliminary matter, we note that the Act requires that the employer and the representative of the employees confer in good faith with respect to wages, hours, and other terms and conditions of employment.[14]  It is now well-settled that rules governing tobacco use constitute terms and conditions of employment for purposes of the Act.[15]  As such, they are subject to the good faith bargaining requirement imposed by § 158(d).  While the good faith requirement clearly mandates that an employer explain its positions

---

[12]29 U.S.C. § 160(f).  See *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

[13]*United Supermarkets, Inc. v. NLRB,* 862 F.2d 549, 551 (5th Cir.1989)

[14]29 U.S.C. § 158(d)

[15]See *Allied-Signal, Inc.,* 1992 WL 122628 (N.L.R.B.)

8

on various issues and furnish relevant materials,[16] it just as clearly does not compel either party to agree to a proposal or to make concessions.[17] In other words, adamant insistence on a genuinely and sincerely held bargaining position does not constitute bad faith.[18] Ultimately, our assignment is to examine the totality of the employer's conduct, both at and away from the bargaining table, to determine whether the employer has bargained in good faith.[19] With these principles in mind, we consider the Board's findings of fact and conclusions of law.

In rendering its decision, the Board attached particular significance to the following factors: (1) Hi-Tech's repeated references to company-wide policy as a justification for its bargaining position; (2) Manager Jim French's unlawful statement to applicant Jimmy Jones that non-Union employees could secure better benefits than affiliated employees, as well as similar unlawful remarks; and (3) Hi-Tech's refusal to remove one sign at the entrance to the employee parking lot declaring the prohibition of tobacco use at the facility. We discuss these factors in sequence.

(1) Hi-Tech's references to company-wide policy:

---

[16]*Stroehmann Bakeries, Inc. v. NLRB,* 95 F.3d 218 (2d Cir.1996).

[17]*White v. NLRB,* 255 F.2d 564 (5th Cir.1958); 29 U.S.C. § 158(d).

[18]*Chevron Oil Co. v. NLRB,* 442 F.2d 1067, 1072 (5th Cir.1971); *Coastal Electric Cooperative, Inc.,* 1993 WL 243860 at 10 (N.L.R.B.).

[19]*Id.* at 2.

The Board found that Hi-Tech's reference to company-wide policy as a justification for its negotiating position indicated "the futility of union representation" at the bargaining table. This finding enjoys no support in the law, and it fails properly to account for the other concerns expressed by Hi-Tech negotiators during the bargaining sessions. The Board does not direct us to a single case that fairly stands for the proposition that an employer's reliance on company-wide policy for its bargaining position evinces bad faith. Instead, the Board asks us to affirm its own naked finding that Hi-Tech's desire to maintain company-wide uniformity in its tobacco usage policy is indicative of bad faith. We find no basis for such a finding. We also cannot overlook the Company negotiators' repeated expressions of concern over the health-related ramifications of tobacco use. Indeed, we would be hard-pressed to conceive of a more compelling justification for the implementation of a company-wide no-tobacco use policy.

(2) French's unlawful statement and similar unlawful remarks:

The Board found that Jim French and other Company officials violated § 8(a)(1) of the Act by stating to an applicant and an employee that union representation was an impediment to the receipt of better benefits.[20] In turn, the Board concluded that this conduct away from the bargaining table reflected the Company's unwillingness to bargain in good faith over tobacco use. We find

---

[20]We agree with this finding, and thus enforce this aspect of the order.

10

no basis for such a conclusion.  Principally, we find no evidence of a nexus between these unlawful statements and the Company's conduct at the bargaining table.[21]  The statements referred neither to the collective bargaining process nor the specific issue of tobacco use at the facility.  In Chevron Oil Co. v. NLRB,[22] we held that a company official's unlawful, away-from-the-table statements that employees would secure greater benefits without union representative did not justify an inference that the company engaged in bad faith bargaining.[23]  In reaching that conclusion, we noted that the statements were made in isolation and at a time when the company and the union were at a virtual standstill in negotiations.[24]  In this respect, Chevron is similar to the case at bar.  We adopt its reasoning here, and decline to infer bad faith from the statements identified by the Board.

(3) Hi-Tech's failure to remove the sign in the parking lot:

The Board concluded that Hi-Tech's refusal to remove one no-smoking sign at the entrance to the employee parking lot could not be reconciled with the Company's assertion that it intended to bargain in good faith over tobacco use.  Hi-Tech does not dispute that the sign expressly contradicted the remedial notices posted

---

[21]See *River City Mechanical,* 289 NLRB 1503, 1505 (1988) (no evidence that unlawful, away-from-the-table statements made during negotiations influenced the aims or attitudes of employer's negotiations).

[22]442 F.2d 1067.

[23]*Id.* at 1071.

[24]*Id.*

inside the plant. These stated that Hi-Tech had rescinded the no-tobacco use rule. Hi-Tech argues, however, that the Board's finding that "unit employees would reasonably regard the sign as a threat that the ban could still be invoked against them" is purely speculative. Hi-Tech notes, in fact, that at no point during the negotiation process did Union representatives suggest that the presence of the sign created confusion as to the ongoing applicability of the Company's rescission of the no-tobacco rule it had previously sought to implement. Hi-Tech also defends the presence of the sign on the ground that the seminal no-tobacco rule remained in effect for non-bargaining unit employees. Nevertheless, it was not unreasonable for the Board to conclude that the Company's refusal to remove the sign militated against a finding of good faith. Indeed, the Company could have readily allayed the Union's concerns by modifying the sign to reflect the bargaining unit employees' exemption from the no-tobacco rule.

Viewed as part of the overall climate of the bargaining process, however, the effect of this single sign does not rise to a level of seriousness that would allow the Board properly to conclude that Hi-Tech failed to bargain in good faith over the tobacco issue. As we stated above, the good faith inquiry requires us to examine the totality of the employer's conduct both at and away from the bargaining table. It necessarily follows, then, that no single factor is likely to be dispositive of our analysis. Hi-Tech's overall conduct reveals its good faith intention to meet with Union representatives and discuss tobacco use at the

12

Starkville facility. Hi-Tech negotiators repeatedly expressed valid concerns over the detrimental effects of tobacco use on both the employees and the company. Union negotiators, on the other hand, steadfastly refused to discuss these concerns, all the while insisting that the Company accommodate employees who wished to use tobacco. In its own brief, in fact, the Board concedes that "the Union did not address the company's concerns about the effect of tobacco on the health of its employees."

We are not persuaded by the Board's last-minute contention that Company negotiators acted in bad faith by failing to offer certain counterproposals that might have been acceptable to the Union.[25] Hi-Tech representatives endeavored to engage Union negotiators in a dialogue that addressed matters of employee health and potential losses in productivity. Union negotiators explicitly declined to participate in such a dialogue. The Board now asks us to infer bad faith from the Company's failure to offer counterproposals that addressed matters the Union affirmatively refused to consider at the outset of bargaining. We decline to do so. It is unreasonable and illogical to punish the Company for its negotiators' failure to engage in a discussion in which the Union negotiators obdurately refused to participate.

---

[25]In its brief, Hi-Tech states that "the Union never raised the possibility of allowing tobacco use in exchange for employee contributions toward health insurance, no suggested elimination of a vacation day or holiday to make up for lost productivity." Hi-Tech did not, however, suggest that it would have agreed to such proposals. It raised this point merely to illustrate that Union negotiators altogether refused to address Company concerns over adverse health effects and lost productivity.

Both parties were entitled to remain entrenched in their respective positions; neither was forced to capitulate to the other.[26] We hold that there is not substantial evidence to support the Board's finding that Hi-Tech violated § 8(a)(1) and (5) of the Act by refusing to bargain in good faith over the no-tobacco rule.

Finally, Hi-Tech did not act improperly by reimplementing the no-tobacco rule after the parties had reached an impasse. An employer generally may not make unilateral changes in the terms and conditions of employment without union consent.[27] When a legally cognizable impasse occurs, however, "the employer is free to implement changes in employment terms unilaterally so long as the changes have been previously offered to the union during bargaining."[28] Since Hi-Tech proposed the implementation of a no-tobacco rule during bargaining, it was not foreclosed from unilaterally implementing it after the parties had reached an impasse.[29] Accordingly, we overturn that aspect of the Board's order requiring the Company to rescind the no-tobacco rule on request by the Union.

---

[26]See *NLRB v. American Insurance Co.,* 343 U.S. 395, 401–404, 72 S.Ct. 824, 828–829, 96 L.Ed. 1027 (1952).

[27]*Huck Mfg. Co. v. NLRB,* 693 F.2d 1176, 1186 (5th Cir.1982).

[28]*Id.;* See also *P.R.C. Recording Co. v. NLRB,* 836 F.2d 289, 292-93 (7th Cir.1987).

[29]The Board argues that the Company could not rely upon the impasse as a defense to unilateral reimplementation of the rule because arrival at a bona fide impasse presupposes that the employer bargained in good faith. Since we hold that the Company bargained in good faith, the Board's argument must fail.

14

## B. The Remaining Issues

We have thoroughly reviewed the record and the parties' respective briefs, and conclude that substantial evidence supports the remainder of the Board's findings. We take a moment, however, to address the Company's contention that it properly withdrew recognition from the Union.

A union's majority status is irrebuttably presumed to continue for a reasonable period—typically one year from the date of its certification.[30] Thereafter, the employer may rebut the presumption that the union enjoys majority support by affirmatively showing (1) that it had a reasonable, objectively-based good faith belief that the union no longer represented a majority of the bargaining unit employees, or (2) that the union in fact no longer represented the majority of the employees.[31] Our cases make it clear, however, that "an employer cannot lawfully withdraw recognition from a union if it has committed yet unremedied unfair labor practices that could have reasonably tended to contribute to employee disaffection from the union."[32] Regarding the nexus that must exist between the unfair labor practices and employee disaffection, we have stated that "the question is simply whether [the employer's] actions could have contributed to employee

---

[30]*United Supermarkets,* 862 F.2d at 552.

[31]*Id.*

[32]*Id.* at 554. See also *NLRB v. Powell Electrical Mfg. Co.,* 906 F.2d 1007, 1014-15 (5th Cir.1990); *Pittsburgh & New England Trucking,* 249 NLRB 833, 836 (1980).

15

disaffection."[33]  Direct evidence of causation is not required.[34]

Hi-Tech based its belief that the Union no longer represented a majority of the bargaining unit employees on its receipt of decertification cards signed by 117 of the 203 unit employees.  The Board, however, found that the cards did not form a reasonable basis to doubt the Union's majority status because they were solicited in a climate of various unremedied unfair labor practices.[35]  We believe that substantial evidence supports this conclusion.  First, we agree with the Board that Hi-Tech committed numerous unfair labor practices in the months immediately preceding its receipt of the decertification cards.  Second, it was quite reasonable for the Board to conclude that these practices tainted the decertification process, particularly since several violations consisted of Company managers promising greater rewards to employees if they broke ranks with the Union or otherwise ceased demonstrating pro-Union sentiments.  The Company's argument that the isolated nature of the unfair labor practices in question precluded a finding that they caused significant employee

---

[33]*NLRB v. Powell Electrical Mfg. Co.,* 906 F.2d at 1015.

[34]*Columbia Portland Cement Co. v. NLRB,* 979 F.2d 460, 465 (6th Cir.1992).

[35]The Board also found that 42 of the 117 decertification cards could not be credited because they were signed between February 11 and March 7, 1993, the period during which Hi-Tech was complying with the Board's 1992 order by posting notices announcing the rescission of the no-tobacco rule.  The Board explained that cards solicited during a remedial notice posting period are not reliable indicators of employee sentiment.  *Robertshaw Controls Co.,* 263 NLRB 958, 959-60 (1982).  On this basis alone, the Company was unjustified in withdrawing recognition from the Union.

16

disaffection is without merit. Given the temporal proximity between the unfair labor practices and the withdrawal of recognition, it was not unreasonable for the Board to conclude that many of the employees who signed the cards might have been induced to do so by the Company's unlawful actions.[36] Substantial evidence supports the Board's finding.

### III.

The Board's petition for enforcement of its order regarding the bargaining over, and subsequent implementation of, the no-tobacco usage policy is DENIED. The remainder of the petition is GRANTED.

JOHN MINOR WISDOM, Circuit Judge, specially concurring.

I am satisfied that Hi-Tech approached the bargaining process in good faith.

While I applaud the Company's insistence on taking steps to preserve the health of its work force, I believe that the Company might have given some consideration to the fact that many of its current, tobacco-addicted employees were hired at a time when smoking was permitted.

---

[36]See *Powell Electrical Mfg. Co.,* 906 F.2d at 1015 n. 6; *Columbia Portland Cement Co.,* 979 F.2d at 465 (unfair labor practices that occurred within one year of the decertification petition precluded a finding that the employer entertained good faith doubts as to the union's continuing majority status).