# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

June 16, 2020

Lyle W. Cayce
Clerk

No. 18-60474

DENTON COUNTY ELECTRIC COOPERATIVE, INCORPORATED, doing business as CoServ Electric,

Petitioner Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent Cross-Petitioner.

On Petitions for Review and Cross-Application
For Enforcement of an Order of the
National Labor Relations Board

Before DAVIS, STEWART, and ELROD, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

The March 18, 2020 opinion filed in this case is WITHDRAWN, and the following is substituted in its place.

Denton County Electric Cooperative (CoServ) challenges the National Labor Relations Board (Board) ruling that it engaged in unfair labor practice and the Board's issuance of an affirmative bargaining agreement and public-notice-reading order. The Board cross-applies for enforcement. We DENY CoServ's petition for review in part and GRANT in part. We DENY in part and GRANT in part the Board's cross-application for enforcement.

No. 18-60474

I.

CoServ is an electrical cooperative corporation in Corinth, Texas. CoServ hires various types of employees to conduct its business: linemen, groundmen, journeymen, servicemen, power quality technicians, system operators, and senior system operators.

At least from 2009 to 2014, CoServ gave raises to its employees based on either the Employee Development Program (EDP) structure or the non-EDP structure. Of CoServ's employees, "linemen are part of the lockstep EDP. The EDP anticipates that linemen advance to the next level every six months and receive an automatic raise with each advancement." Other employees who are not part of the EDP—such as system operators, power quality technicians, etc.—are compensated on an hourly rate within the established wage ranges for each position and given "merit-based, discretionary raises" based on their annual performance evaluation.

CoServ contracts with an outside firm to provide an annual compensation survey called the Mercer Study that recommends wage-range adjustments. Between 2009 and 2014, CoServ increased the wage range according to the Mercer Study every year.

On July 27, 2012, after a Board-certified election, the Union became the exclusive bargaining representative for 32 CoServ employees. In December 2012, CoServ proposed, and the Union accepted, an interim rate increase for EDP employees while the collective bargaining process continued. In January 2013, CoServ proposed, and the Union accepted, an interim pay increase for non-EDP employees as well.

While CoServ and the Union continued negotiating in 2013, a Union employee filed a decertification petition with the Board. On October 28, 2013, the decertification vote was held, and the Union survived by a single vote.

2

No. 18-60474

In early 2014, CoServ continued to conduct annual evaluations but did not give a raise.  In response to the lack of raises, the Union filed an unfair labor practice complaint with the Board against CoServ alleging: (1) that the suspension of raises violated Section 8(a)(5) of the National Labor Relations Act (NLRA), which requires an employer to bargain with the union chosen by a majority of its employees, and (2) that blaming the lack of raises on the Union violated Section 8(a)(1), which prohibits the employer from interfering with the employees' exercise of labor rights.

Three employees—Robert Shelby, Derek Wolzen, and Chad Beck—testified before the ALJ that their supervisor Kevin Vincent blamed the Union for the lack of raises that year during their performance reviews.  Shelby testified that Vincent told him that "there will not be a raise . . . because . . . CoServ . . . was waiting for the [U]nion."  Wolzen testified that Vincent told him that he would not receive a raise or promotion "because it's tied up in [U]nion and CoServ negotiations," and because the Union had "rejected a contract offer that would have enabled us to get more money."  Beck also testified that Vincent told him that "the reason you're not going to get a raise is because of the [U]nion."

On November 4, 2014, the Board and CoServ reached a settlement agreement.  Under the settlement agreement, CoServ agreed to implement the wage increase, pay back pay to the employees, and post a remedial notice for 60 days after the final approval of the agreement.  The settlement agreement contained a "non-admission clause" stating that CoServ "does not admit that it has violated the National Labor Relations Act."[1]  The settlement agreement also provided that CoServ "shall commence [the performance of the agreement]

---

[1] Although CoServ did not admit to wrongdoing in the settlement agreement, the Board found that CoServ had committed unfair labor practices in later proceedings.

No. 18-60474

immediately after the Agreement is approved by the Regional Director." The Board's Regional Director approved the settlement agreement on November 21, 2014.

Between November 3 and 18, 2014, CoServ's employees circulated a second decertification petition which garnered 28 out of 32 votes to oust the Union. The employees filed the petition with the Board on November 19, 2014, and then provided a copy to CoServ on November 25, 2014.

Throughout November 2014—despite the complaint and the second decertification petition—the Union and CoServ continued negotiating for a collective bargaining agreement. On November 25, 2014, CoServ and the Union met for a final bargaining session. The parties agreed to finalize the previously discussed tentative agreement by signing and dating it later. The finalized agreement would have prevented CoServ from unilaterally withdrawing the recognition of the Union.[2] On November 26, 2014, after receiving the second decertification petition, CoServ informed the Union that it no longer recognized the Union and would not bargain with the Union.

After withdrawing its recognition of the Union, CoServ did not provide certain information that the Union had requested. Furthermore, in 2015, CoServ returned to its practice of compensating its employees according to the Mercer Study.

The Union filed unfair labor practice charges regarding CoServ's alleged unfair labor practices. An administrative law judge ruled against CoServ. Both sides filed exceptions. A three-member panel of the Board found that CoServ committed unfair labor practices by failing to increase the employees' wage ranges and blaming the Union for the lack of raises. The Board, however,

---

[2] Whether the collective bargaining agreement was formed and became enforceable is not before this court. The ALJ, however, found that the collective bargaining agreement was not finalized.

No. 18-60474

did not impose independent sanctions for these unfair labor practices as the Board had settled these allegations previously through the settlement agreement. Instead, the Board found that these unfair labor practices tainted the second decertification petition that ousted the Union. Accordingly, the Board found that CoServ unlawfully withdrew the recognition of the Union and failed to provide requested information to the Union.

To remedy the unlawful withdrawal of recognition and unlawful withholding of information, the Board issued a cease-and-desist order to prevent CoServ from refusing to bargain with the Union; an affirmative bargaining order requiring CoServ to bargain with the Union and prohibiting it from withdrawing recognition for a reasonable period of time; and a public-notice-reading order. CoServ filed a petition for review and the Board filed a cross-application for enforcement.

II

There are four primary issues in this case: (1) whether substantial evidence supports the Board's findings of unfair labor practices; (2) whether substantial evidence supports the Board's finding that CoServ's unfair labor practices tainted CoServ employees' second decertification petition ousting the Union; (3) whether the Board properly issued an affirmative bargaining order; and (4) whether the Board properly issued a public-notice-reading order.

We hold that CoServ's challenge against the Board's findings of unfair labor practices fails. We also hold that under the governing four-factor test, substantial evidence supports the Board's finding that CoServ's unfair labor practices tainted the second decertification petition. As to the affirmative bargaining order, however, we determine that the Board failed to justify the bargaining order under Fifth Circuit case law. Under our case law, a bargaining order was not justified and therefore, we vacate. Finally, we vacate

5

No. 18-60474

the Board's issuance of the public-notice-reading order because it cannot be justified under the facts of this case. We discuss each issue in turn.

A

CoServ contends that the Board erred in determining that CoServ committed unfair labor practices by failing to give raises to its employees and blaming the Union for the lack of raises.[3] The Board subsequently found that these unfair labor practices tainted the second decertification petition that ousted the Union. CoServ challenges these underlying findings that it committed unfair labor practices. The Board contends that CoServ waived any challenge to these findings by failing to adequately brief the issue. Alternatively, the Board argues that its determination that CoServ committed unfair labor practices is correct because it is well-established that attributing lack of wage increases to a union violates Section 8(a)(1) of the NLRA. *See Twin City Concrete, Inc.*, 317 NLRB 1313, 1318 (1995). Assuming arguendo that CoServ's argument is adequately briefed[4], it nonetheless fails on its merits.

---

[3] These are the same alleged unfair labor practices that CoServ and the Board settled. Because of the settlement agreement, the Board did not independently impose sanctions for *these* violations. Instead, the Board merely relied on these unfair labor practices to determine whether the subsequent decertification petition was tainted and then imposed remedies for the unlawful withdrawal of recognition and withholding of information from the Union only.

[4] Federal Rule of Appellate Procedure 28(a)(8)(A) requires an appellant's opening brief to contain the "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." "We have often stated that a party must 'press' its claims." *United States v. Scroggins*, 599 F.3d 433, 447 (5th Cir. 2010) (quoting *Knatt v. Hospital Serv. Dist. No. 1 of E. Baton Rouge Parish*, 327 F.App'x 472, 782 (5th Cir. 2009)). "At the very least, this means clearly identifying a theory as a proposed basis for deciding the case—merely 'intimat[ing] an argument is not the same as 'pressing' it." *Id.* "[A]mong other requirements to properly raise an argument, a party must ordinarily identify the relevant legal standards." *Id.* We have construed this to mean that an appellant's opening brief forfeits an issue if it "provides no explanatory analysis or supporting authority" for a particular contention. *Maria S. ex. rel. E.H.F. v. Garza*, 912 F.3d 778, 782 n.3 (5th Cir. 2019). We have also said that "[a]rguments subordinated in a footnote are insufficiently addressed in the body of the brief" and thus are forfeited. *Arbuckle Mountain Ranch of Tex. v. Chesapeake Energy Corp.*, 810 F.3d 335, 339 n.4 (5th Cir. 2016).

No. 18-60474

We review the Board's finding of unfair labor practices for substantial evidence. *El Paso Elec. Co. v. NLRB*, 681 F.3d 651, 656 (5th Cir. 2012). The Board's finding that CoServ blamed the lack of raises on the Union is supported by substantial evidence. The Board reviewed the testimony put before the ALJ and the associated credibility determinations made by the ALJ. Vincent, a manager at CoServ, testified that he had not blamed the lack of raises on the Union. The ALJ found that Vincent was "a less than candid witness, who mostly appeared motivated to aid [CoServ] and its leadership [and] escape culpability." [ROA 1685] The Board then juxtaposed this testimony with that of three CoServ employees who all stated that they heard Vincent blame the lack of raises and promotions on the Union. [ROA 1685] The Board cited the ALJ's statement that the three employees had nothing to gain from testifying against Vincent, while Vincent had incentive to deny the statements as he was in a leadership position at CoServ. The Board found the ALJ "properly discredited [Vincent's] testimony." [ROA 1685]

We are "bound by the credibility choices of the ALJ, unless: (1) the choice is unreasonable; (2) the choice contradicts other findings of fact; (3) the choice is based on inadequate reasons or no reasons; or (4) the ALJ failed to justify the choice." *Valmont Industries, Inc. v. NLRB*, 24 F.3d 454, 463–64 (2001). Here, the ALJ explained its reasoning and justified its choice to credit the three CoServ employees' testimony over Vincent's. The testimony supports the finding that CoServ management blamed the lack of raises on the Union. Doing so is clearly established as an unfair labor practice under the NLRA. *See Twin City Concrete*, 317 NLRB at 1318 ("[I]t is well settled that an employer violates the Act by attributing its failure to grant promised wages and benefits to the presence of the union or pending election."); *see also America's Best Quality Coatings Corp.*, 313 NLRB 470 (1993).

7

No. 18-60474

We deny CoServ's petition for review on this issue because the Board's finding that CoServ committed unlawful unfair labor practices is supported by substantial evidence.

B

The second issue before us is whether substantial evidence supports the Board's conclusion that CoServ's unfair labor practices tainted the employees' second decertification petition ousting the Union. The Board's theory is that CoServ's unfair labor practices—failing to give raises and blaming the Union for the lack of raises—created disaffection toward the Union and "tainted" the second decertification petition that ousted the Union. CoServ argues that, even assuming that CoServ's failure to increase wages was an unfair labor practice, this does not support a finding of taint. We hold that substantial evidence supports the Board's finding of taint.

We review the Board's finding of taint for substantial evidence. *See Tenneco Auto., Inc. v. NLRB*, 716 F.3d 640, 649 (D.C. Cir. 2013); *see also NLRB v. Hi-Tech Cable Corp.*, 128 F.3d 271, 278–79 (5th Cir. 1997). "Substantial evidence is 'such relevant evidence that a reasonable mind would accept to support a conclusion.'" *NLRB v. Allied Aviation Fueling of Dallas, LP*, 490 F.3d 374, 378 (5th Cir. 2007) (quoting *Valmont Indus., Inc. v. NLRB*, 244 F.3d 454, 463 (5th Cir. 2001). We do not disturb a finding "simply because the evidence may also reasonably support other inferences or because we might well have reached a different result had the matter come before us de novo." *NLRB v. Universal Packing & Gasket Co.*, 379 F.2d 269, 270 (5th Cir. 1967).

1

"Section 8(a)(5) makes it an unfair labor practice for an employer 'to refuse to bargain collectively with the representative[e] of [its] employees'; it is violated if a company disregards the bargaining representative by acting unilaterally or dealing directly with employees." *NLRB v. Arkema, Inc.*, 710

8

F.3d 308, 320 (5th Cir. 2013) (alterations in original) (citations omitted) (quoting 29 U.S.C. § 158(a)(5)). "Section 8(a)(1) violations are derivative of violations of § 8(a)(5). A violation of § 8(a)(1) occurs when an employer takes adverse action against specific employees in connection with terms and conditions of their employment that are subject to collective bargaining." *Id.* (quoting *El Paso Elec. Co. v. NLRB*, 681 F.3d 651, 657 (5th Cir. 2012)).

The requirement that the employer bargain with the union "attaches only for so long as the union retains the support of a majority of employees in the bargaining unit." *Tri-State Health Serv., Inc. v. NLRB*, 374 F.3d 347, 352 (5th Cir. 2004). Under the Board's precedent, a union carries a rebuttable presumption that it enjoys a majority support. *Levitz Furniture Co.*, 333 N.L.R.B. 717, 723-24 (2001); *see also Auciello Iron Works, Inc. v. NLRB*, 517 U.S. 781, 786 (1996); *Tri-State*, 374 F.3d at 352. "An employer may overcome this . . . presumption and refuse to bargain if it shows either that the union did not enjoy majority support within the relevant bargaining unit, or that the employer had a '"good-faith" doubt, founded on a sufficient objective basis, of the union's majority support.'" *Tri-State*, 374 F.3d at 352 (quoting *NLRB v. Curtin Matheson Sci., Inc.*, 494 U.S. 775, 778 (1990)).

Although "objective evidence" of the loss of majority status—such as a decertification petition—could serve as basis for rebutting the presumption of majority status, *Levitz Furniture*, 333 N.L.R.B. at 725, "an employer cannot lawfully withdraw recognition from a union if it has committed yet unremedied unfair labor practices that could have reasonably tended to contribute to employee disaffection from the union," *Hi-Tech Cable Corp.*, 128 F.3d at 279 (quoting *United Supermarkets, Inc. v. NLRB*, 862 F.2d 549, 554 (5th Cir. 1989)); s*ee also Williams Enters., Inc v. NLRB*, 956 F.2d 1226, 1234 (D.C. Cir. 1992) ("An employer is precluded . . . from asserting a good faith doubt based on an employee petition when the employer's unfair labor practices

'significantly contribute' to the loss of majority status by undercutting the employees' support of the union." (quoting *St. Agnes Med. Center v. NLRB*, 871 F.2d 137, 147 (D.C. Cir. 1989)). "In other words, if erosion of workers' support for a union is 'tainted' by an employer's prior bad acts, that taint renders the union's presumption of continuing majority support temporarily conclusive." *Veritas Health Servs., Inc. v. NLRB*, 895 F.3d 69, 79 (D.C. Cir. 2018).

In *Hi-Tech Cable Corp.*, this court required that, to prove "taint," there be a "nexus . . . between the unfair labor practices and employee disaffection." 128 F.3d at 279. We have not elaborated on a test other than to state that "[d]irect evidence of causation is not required." *Id.* The Board applied an objective, four-factor test to determine whether an employer's prior bad acts could have contributed to or tainted the decertification petition:

> (1) The length of time between the unfair labor practices and the withdrawal of recognition; (2) the nature of the illegal acts, including the possibility of their detrimental or lasting effect on employees; (3) any possible tendency to cause employee disaffection from the union; and (4) the effect of the unlawful conduct on employee morale, organizational activities, and membership in the union.

*Master Slack Corp.*, 271 N.L.R.B. 78, 84 (1984). CoServe has not asked us to review whether the Board's four-factor test in *Master Slack* is arbitrary and capricious or contrary to law, and it appears to agree that *Master Slack* is the correct test. Our analysis simply determines whether substantial evidence supports the Board's finding of "taint" under *Master Slack*.

The *Master Slack* test "calls on the Board to consider the nature and timing of the unfair labor practices as they bear on the *reasonable likelihood* of discouraging employees under a given set of circumstances from continuing to support their union." *Veritas Health*, 895 F.3d at 82 (emphasis added). As the D.C. Circuit has explained, "[t]he *Master Slack* test allows parties to focus on objective and readily discernible considerations." *Id.* "[T]he Board has held

that 'it is the objective evidence of the commission of unfair labor practices that has the tendency to undermine the Union, and not the subjective state of mind of the employees, that is the relevant inquiry in this regard.'" *Id.* (quoting *AT Sys. W., Inc.*, 341 N.L.R.B. 57, 60 (2004)). We consider each of the *Master Slack* factors in turn.

The first *Master Slack* factor is the "[t]he length of time between the unfair labor practices and the withdrawal of recognition." *Master Slack*, 271 N.L.R.B. at 84. The Board concluded that there was little to no lag time between the unfair labor practices and the withdrawal of recognition. More specifically, in the Board's view, "each time the employees received a paycheck without the customary annual raise, they were reminded of the Union's ineffectiveness in preserving such raises, let alone in obtaining additional wage increases." Because the violations were ongoing throughout the year, the Board concluded that the 7 to 11 months between the first denial of raise and the circulation of the second petition were not enough to dissipate the effects of the unfair labor practices.

CoServ fixates on the *first* denial of raises and contends that 7 to 11 months was sufficient time to dissipate the effects of any unfair labor practices. But CoServ overlooks the fact that annual raises (or the lack thereof) were implemented throughout the year on an employee's anniversary date, not on a single day that occurred 7 to 11 months prior to the decertification petition.

The Board's conclusion that the unfair labor practices were being implemented throughout the year—creating little to no lag time between the unfair labor practices and the withdrawal of recognition—is supported by substantial evidence.

The second and third *Master Slack* factors are typically analyzed together. *Tenneco Auto.*, 716 F.3d at 649. The factors are: "the nature of the illegal acts, including the possibility of their detrimental or lasting effect on

employees" and "any possible tendency to cause employee disaffection from the union." *Master Slack*, 271 N.L.R.B. at 84. "These factors obviously are related because unfair labor practices that have a lasting effect[] on employees are likely to be serious enough to cause disaffection with a union." *Tenneco Auto., Inc.*, 716 F.3d at 649.

The unfair labor practice at issue here was the lack of raises. Wage increases are a "bread-and-butter" issue for the Board. *M & M Auto. Grp., Inc.*, 342 N.L.R.B. 1244, 1247 (2004) (finding taint where the employer's "unilateral changes involved the important, bread-and-butter issue[] of wage increases"). The Board concluded that the lack of raises—and CoServ's blaming the Union for the lack of raises—could have had a lasting effect on the employees. The Board cites numerous examples of this "lasting effect," one of which is the "dramatic swing in support" the Union experienced: it won the first decertification vote but lost the second decertification vote almost unanimously. Although the employees specifically testified that the lack of raises or the blame on the Union had nothing to do with their support of decertification, *Master Slacks* is an objective test, and the employees' subjective intent does not matter. *See Veritas Health*, 895 F.3d at 82. The Board could reasonably interpret the "swing" as an effect of CoServ's unfair labor practice that caused disaffection with the union. Substantial evidence supports the board's conclusion that *Master Slack* factors two and three supported a finding of taint.

The fourth *Master Slack* factor asks "the effect of the unlawful conduct on employee morale, organizational activities, and membership in the union." *Master Slack*, 271 N.L.R.B. at 84. This factor also favors the Board's finding of taint.

CoServ argues that that the ALJ did not adequately consider the employees' testimony as to the reasons they stopped supporting the Union.

The employees' reasons were that (1) the Union allegedly did not know what it was doing; (2) the Union allegedly communicated poorly with the employees; (3) the employees believed that the Union was giving money to one political party over the other; (4) the employees believed that they did not have problems with the management previously, thus negating the need for the Union; and (5) the employees' personal preferences for a non-union workplace.

These reasons, however, are not sufficient to disturb the Board's findings. "[S]pecific employees' subjective attitudes" are *not* "the relevant inquiry." *Veritas Health*, 895 F.3d at 82 (quoting *AT Sys. W., Inc.*, 341 N.L.R.B. at 60). And, under the substantial-evidence standard, we cannot disturb a finding "simply because the evidence may also reasonably support other inferences or because we might well have reached a different result had the matter come before us de novo." *Universal Packing & Gasket Co.*, 379 F.2d at 270.

While CoServ points us to evidence in the record that tends to support its position, there is other evidence in the record that demonstrates "a reasonable likelihood the unfair labor practices have a continuing impact upon the employees." *United Supermarkets*, 862 F.2d at 553. The record reflects that employee morale and support for the union cratered after CoServ began unfair labor practice in 2014 as evidenced by the ouster of the Union shortly thereafter.

The Board weighed this evidence and concluded that the unfair labor practice influenced employee morale and membership in the Union. This finding is supported by substantial evidence.

For the forgoing reasons, substantial evidence supports the Board's conclusion that, under the *Master Slack* test, CoServ's unremedied unfair labor practices—lack of raises and blaming the Union—tainted the second

No. 18-60474

decertification that ousted the Union.  We therefore DENY CoServ's petition for review.

C

The third issue before us is whether the Board's decision to issue an affirmative bargaining order was proper.  While the Board alleges that the order was proper under both its own standard and the D.C. Circuit's standard, it failed to analyze the propriety of the order under Fifth Circuit law.  We determine that under this circuit's case law, the affirmative bargaining order was improper.  We therefore grant CoServ's petition for review and vacate the affirmative bargaining order.

The Board issued an affirmative bargaining order that requires CoServ to bargain with the Union and imposes a decertification bar that prohibits CoServ from withdrawing recognition of the Union for a reasonable period of time.  The Board issued the order after concluding that the bargaining order was appropriate under both the Board's more lenient standard in *Caterair*, 322 N.L.R.B. 64 (1996), and the D.C. Circuit's more stringent standard in *Vincent Indus. Plastics, Inc. v. NLRB*, 209 F.3d 727 (D.C. Cir. 2000).  In its petition for review, CoServ argues that the bargaining order was inappropriate under the D.C. Circuit's precedent.  The Board argues that because we have not adopted the D.C. Circuit's standard, we should apply the Board's more lenient standard, under which the Board claims it easily prevails; alternatively, the Board argues that it prevails even under the D.C. Circuit's higher standard.

Both parties, however, initially failed to analyze the propriety of the bargaining order under applicable Fifth Circuit law.  *See Cal. Gas Transp., Inc. v. NLRB*, 507 F.3d 847 (5th Cir. 2007); *NLRB v. Am. Cable Sys., Inc.*, 414 F.2d 661 (5th Cir. 1969).  We requested supplemental briefs on whether and how this court's cases bear on assessing the propriety of the bargaining order in this case.  We determine that Fifth Circuit case law provides the relevant standard

14

the Board should have looked to and that it does not support the issuance of the bargaining order.

1

Under Section 10(c), 29 U.S.C. § 160(c), the Board has the power to remedy unfair labor practices by ordering a violator "to cease and desist from such unfair labor practice, and to take such affirmative action . . . as will effectuate the policies of" the NLRA.  Although "[t]he Board's exercise of remedial authority under Section 10(c) of the [NLRA], 29 U.S.C. § 160(c), is entitled to 'the greatest deference,'" *In-N-Out Burger, Inc. v. NLRB*, 894 F.3d 707, 720 n.7 (5th Cir. 2018) (quoting *ABF Freight Sys., Inc. v. NLRB*, 510 U.S. 317, 324 (1994)), an order issued by the Board will not stand if it constitutes "a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act," *NLRB v. Seven-Up Bottling Co. of Miami*, 344 U.S. 344, 347 (1953) (quoting *Va. Elec. & Power Co. v. NLRB*, 319 U.S. 533, 540 (1943)).  In reviewing a bargaining order, we review for an abuse of discretion if the underlying findings of unfair labor practices are supported by substantial evidence.  *NLRB v. U.S.A. Polymer Corp.*, 272 F.3d 289, 297 (5th Cir. 2001).

2

We have explained that "[a] remedial bargaining order is precisely what its name suggests; it is a remedy that requires an employer to bargain with a union as the exclusive representative of an employee unit." *Cal. Gas Transp.*, 507 F.3d at 853.  A bargaining order also imposes a decertification bar that prohibits the employer from withdrawing recognition of the union for a reasonable period of time until "the effects of the employer's [union-discouraging] acts have worn off."  *Id.* at 853 n.4 (alteration in original) (quoting *NLRB v Gissel Packing Co.*, 395 U.S. 575, 613 (1969)); *see also Williams Enters., Inc. v. NLRB*, 956 F.2d 1226, 1237 (D.C. Cir. 1992) ("A

bargaining order carries with it a 'decertification bar' that requires the employer to recognize the union for a reasonable time in the future.").

The Supreme Court opinion in *NLRB v. Gissel Packing Co.* established two categories of cases in which bargaining orders are justified. 395 U.S. at 613–14.

> In a *Gissel* category I case, the Board may enter a remedial bargaining order, even if the union cannot demonstrate that it was supported by a majority of the unit, to remedy "outrageous and pervasive unfair labor practices" if the "coercive effects cannot be eliminated by the application of traditional remedies, with the result that a fair and reliable [union] election cannot be had."

*Cal. Gas Transport.*, 507 F.3d at 854 (alteration in original) (quoting *Gissel*, 395 U.S. at 613–14). CoServ's case does not fall under category I as the Union had initially gained the support of a majority of CoServ's employees through a successful election.

"In a *Gissel* category II case, the Board may enter a remedial bargaining order to remedy 'less pervasive [unfair labor] practices which nonetheless still have the tendency to undermine majority strength and impede the election process' but only if the union once had majority support." *Id.* (alteration in original) (quoting *Gissel*, 395 U.S. at 614). Once a case is determined to fit *Gissel* category II, there are differing tests a court can apply in determining whether a bargaining order is justified.

The parties dispute whether CoServ's case falls within *Gissel* category II. The Board maintains that this is a "non-*Gissel*" case that nonetheless warrants a bargaining order. But we disagree. In *Gissel*, the Supreme Court held that bargaining orders can be appropriate in two categories of cases, now referred to as *Gissel* categories I and II. 395 U.S. at 613–14. It also noted that there is "a third category of minor or less extensive unfair labor practices, which, because of their minimal impact on the election machinery, will not

16

sustain a bargaining order." *Id.* at 615. Accordingly, a bargaining order is appropriate only in a category I or category II case. The Board's characterization that this is a "non-*Gissel*" case that nonetheless warrants a bargaining order does not square with *Gissel*.

Here, the Union had initially garnered majority support, and the Board itself alleges that CoServ's unremedied unfair labor practices tainted the second decertification election because the Union no longer had majority support. We thus determine that this case fits squarely within *Gissel* category II. As a *Gissel* category II case, the Board needed to determine if a remedial bargaining order was necessary under our relevant precedent.[5]

We recognize that "[t]he imposition of a bargaining order is an *extraordinary* remedy." *U.S.A. Polymer*, 272 F.3d at 297 (emphasis added). The Board may issue an affirmative bargaining order in a *Gissel* category II case if:

> (a) the union had valid authorization cards from a majority of employees in an appropriate bargaining unit; (b) the employer's unfair labor practices, although not "outrageous" and "pervasive" enough to justify a bargaining order in the absence of a card majority, were still serious and extensive; (c) "the possibility of

---

[5] We do not view the D.C. Circuit's standard as interchangeable with ours. This court's standard expressly probes the seriousness and extent of the unfair labor practices, whereas the D.C. Circuit's standard indirectly asks about the harm in determining the adequacy of alternative remedies. Regarding the efficacy of the alternative remedies, this court's inquiry focuses specifically on the election process whereas the D.C. Circuit asks more generally about labor law violations. And finally, although both this court and the D.C. Circuit ask about employee sentiment and rights, the D.C. Circuit also asks whether the "other purposes of the Act" may override employee sentiment and rights. *Vincent Indus.*, 209 F.3d at 738. Simply put, this court's standard requires a higher level of specificity in justifying a bargaining order then the D.C. Circuit's test requires.

The Board's standard varies significantly from that of both this court and the D.C. Circuit. The Board has held that "an affirmative bargaining order is the traditional, appropriate remedy for [a] refusal to bargain" with a union, and that it can be issued as a matter of course. *Caterair*, 322 N.L.R.B. at 68. Thus, according to the Board, bargaining orders do not need to be justified by the facts of the case. *Id.*

erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight"; and (d) employee sentiment can best be protected in the particular case by a bargaining order.

*Cal. Gas Transp.*, 507 F.3d at 854–55 (quoting *Am. Cable Sys.*, 414 F.2d at 668–69).

Here, the Board justified the bargaining order under both its own standard in *Caterair* and the D.C. Circuit standard. But it should have applied this Circuit's standard in determining the propriety of the bargaining order as "[a] holding by a court of appeals on a legal question is binding on [an agency] in all cases arising within that circuit until and unless the court of appeals or the Supreme Court overturns that holding." *Smith Steel Casting Co. v. Donovan*, 725 F.2d 1032, 1035 (5th Cir. 1984).

The bargaining order cannot stand under our binding precedent. As discussed above, a bargaining order in a category II case can only be issued if the factors detailed in *California Gas Transport* are met. *See* 507 F.3d at 854–55 (quoting *Am. Cable Sys.,* 414 F.2d at 668–69). Here, even before CoServ committed any unfair labor practices, the employees almost ousted the Union in the first decertification vote. And the employees who testified indicated that CoServ's unfair labor practices were not the motivation for the second, successful decertification vote. A bargaining order would not protect employee sentiment because it would nullify their concerted decertification efforts and bar them from decertifying the Union for a reasonable period of time.

Accordingly, we GRANT CoServ's petition for review and VACATE the bargaining order.

D

The fourth issue raised in CoServ's petition is whether the Board properly issued a public-notice-reading order. The Board ordered CoServ to read remedial notices aloud to its employees—either by its president, its vice

president, or, if it wishes, a Board agent. "Public notice reading in particular is designed to 'ensure that the important information set forth in the notice is disseminated to all employees, including those who do not consult the [employer's] bulletin boards.'" *UNF W., Inc. v. NLRB*, 844 F.3d 451, 463 (5th Cir. 2016) (quoting *Excel Case Ready*, 334 N.L.R.B. 4, 5 (2001)). "[F]or repeated violations persisted in despite intervening declarations of illegality, the Board is warranted in impliedly concluding that such conduct has created a chill atmosphere of fear and, further, in recognizing that the reading requirement is an effective but moderate way to let in a warming wind of information and, more important, reassurance." *Id.* (quoting *J.P. Stevens & Co. v. NLRB*, 417 F.2d 533, 540 (5th Cir. 1969)). CoServ argues that because it was not a repeat violator and because its conduct did not create a "chill atmosphere of fear" that the public-notice-reading order was unwarranted. We agree.

Both parties heavily rely on the D.C. Circuit's decision in *HTH Corp. v. NLRB*, 823 F.3d 668 (D.C. Cir. 2016). In *HTH*, the D.C. Circuit examined the potential perils of public-notice-reading orders. It explained that "[t]he public reading by the employer of the order would . . . be humiliating and degrading to the employer and undoubtedly would have a lingering effect on future relations between the company and the Union." *Id.* at 675 (quoting *Int'l Union of Elec., Radio & Mach. Workers v. NLRB*, 383 F.2d 230, 233 (D.C. Cir. 1967)). The court in *HTH* was concerned that such a mandated "confession of sins" by the employer "conjure[d] up the system of 'criticism-self-criticism' devised by Stalin and adopted by Mao," *id.* at 677 and was "incompatible with the democratic principles of the dignity of man," *id.* at 675 (quoting *Int'l Union*, 383 F.2d at 234). Nevertheless, the D.C. Circuit upheld the public-notice-reading order at issue in *HTH* because of "the company's long history of unlawful practices and the severe violations" and "the option of having the

notice read by a Board employee" in lieu of the company's senior leaders. *Id.* at 678.

On this issue we are in complete agreement with the D.C. Circuit and share its skepticism regarding public-notice-reading orders. We do not think the facts of this case give rise to such an order. CoServ was not a repeat violator. In its brief, the Board explained that it has "ordered notice-reading when an employer's unfair labor practices are serious and widespread *even if the employer is not a repeat offender*." We disagree with this practice.

As to the severity of the offenses, the dispositive question is whether "such conduct has created a chill atmosphere of fear" among the employees. *J.P. Stevens & Co.*, 417 F.2d at 540. It is unlikely that there was a "chill atmosphere of fear" here. The workers narrowly failed to oust the union the first time, the workers almost unanimously voted to oust the Union the second time, and the workers testified that the lack of raises had nothing to do with their decision to oust the Union. CoServ's conduct, both in type and frequency, was not as egregious as cases in which this court has upheld a public notice reading order. *See e.g. UNF W.*, 844 F.3d at 463 (upholding a public notice reading when there was repeated violations with the same problematic conduct).

The option to have the notice read by a board member does not assuage our concerns. Although the order does give CoServ the option to have the notice read by a Board member, it still requires that the notice be read by a Board agent "in the presence of either [CoServ's president] or [vice-president]." Many of the same concerns with the order are present even when a board member reads the order and here there is no justification for the public-notice-reading order. We GRANT CoServ's petition for review and determine that the public-notice-reading order was improper and should be VACATED.

No. 18-60474

III

For the foregoing reasons, we DENY CoServ's petition for review in part and GRANT in part. The affirmative bargaining order and public-notice-reading order are VACATED. The Board's cross-petition for enforcement is GRANTED in part and DENIED in part.